**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**A. Scott DEVOUS, Defendant-Appellant.**

**No. 84–1279.**

United States Court of Appeals,
Tenth Circuit.

June 21, 1985.

Francis Leland Pico, Asst. U.S. Atty., Cheyenne, Wyo. (Richard A. Stacy, U.S. Atty. with him on brief), for plaintiff-appellee.

David L. Grindstaff (Margaret J. Clark with him on brief), Salt Lake City, Utah, for defendant-appellant.

Before BARRETT and BREITENSTEIN, Circuit Judges, and WEINSHIENK,* District Judge.

* The Honorable Zita L. Weinshienk, United States District Judge for the District of Colorado, sitting by designation.

BARRETT, Circuit Judge.

Dr. A. Scott Devous appeals his conviction on three counts of violation of the federal drug statutes. Count I of the indictment charged Devous with the knowing and intentional distribution of a Schedule II controlled substance (Demerol), outside the course of his professional practice, to one Dawn Velikaneye, in violation of 21 U.S.C. § 841(a)(1). Count II charged that Devous had knowingly and intentionally acquired Demerol by misrepresentation, fraud, deception or subterfuge, in violation of 21 U.S.C. § 843(a)(3). Count III charged that Devous had failed to keep the records required by statute of disposition of several thousand capsules of Obermine (phentermine) and Bancap with codeine, in violation of 21 U.S.C. § 843(a)(4)(A).

Dr. Devous moved to Green River, Wyoming, in May, 1982. He was a general practitioner and also had a weight loss clinic. R.Supp. Vol. II at 222. In February, 1983, he hired Dawn Velikaneye as a physician's assistant. The two were initially friends, but eventually became lovers. R.Supp. Vol. II at 225. At some point, they (and perhaps others) began using Demerol for recreational purposes. An investigation by the Wyoming Board of Medical Examiners revealed that Devous had written prescriptions for office use of a total of 200 bottles[1] of Demerol at local pharmacies between January 1 and March 23, 1983. A state investigator testified that this amount of Demerol was more than the entire Ivinson Memorial Hospital in Laramie, Wyoming, had used during that time. R.Supp. Vol. I at 104–105.

After being confronted by the Board of Medical Examiners and told to account for this unusually large amount of Demerol, Devous attempted to purchase 40 more bottles of the drug from Pay Less Drugs in Green River. He telephoned the owner, Larry Hill, and told Mr. Hill that he needed the bottles because Dr. Sandy Brown, a physician from Salt Lake City, was going to visit the office and do some gastroentol-

ogy procedures. R.Supp. Vol. I at 118. (This was subsequently contradicted by testimony from Dr. Brown. R.Supp. Vol. I at 55.) Devous sent Velikaneye to the pharmacy with a federal DEA Form 222. She filled out the form at the pharmacy and picked up the 40 bottles of Demerol. Devous then instructed Velikaneye to pour the Demerol from the bottles into an "IV" bag and refill the bottles with "IV" solution. Devous then went to the police with the bottles and had them destroyed, intending to take the police report of the destruction to the Board of Medical Examiners.

On April 20, Devous called the Green River police to report that Velikaneye was a drug user and had been using his DEA forms to acquire large quantities of Demerol. R.Supp. Vol. II at 374, 375. The police responded by visiting Velikaneye at her home and confronting her with Devous' accusations. Velikaneye then decided, on her own initiative, to invite Devous to her home and secretly tape a conversation with him whereby he might incriminate himself. This was done; a cassette tape was made on April 23 in which Devous repeatedly asked Velikaneye to go to the police and admit that she, and not Devous, was responsible for the Demerol purchases. Velikaneye then took the tape to the police. She was eventually granted immunity from prosecution in exchange for her testimony against Devous.

The major issue that we must resolve is whether the use of a copy of the original tape at trial, together with a transcript prepared primarily by Velikaneye, constituted reversible error.

### I.

The trial court allowed the Government to play for the jury three reel-to-reel tapes. Pl.Exh. 14, 15, 16. These tapes were copied by the Green River police from a single cassette tape on which the conversation between Devous and Velikaneye was originally recorded. Velikaneye had apparently

---

1. These bottles varied in size; most were 30 cc bottles about two or three inches long. R.Supp. Vol. I at 97–98.

hidden a microphone under a sofa; the quality of the recording varied, possibly due to the varying proximity of Devous and Velikaneye as they were speaking. Examples of some of the audible portions of the tapes follow: [2]

Devous: They [the police] say what?

Velikaneye: That you're setting me up because uh, you're in trouble with the medical board, some shittin' thing and I said that I don't know about I don't know anything about it. I said, you know—I can't say anything about it.

Devous: I want you to tell them that you do know about this. You tell them that the Demerol I'm short, you ordered. And you got. You tell 'em that.

Velikaneye: I'm not going to be responsible for forty bottles worth of Demerol!

Devous: Dawn, I'm responsible. Not you.

\* \* \* \* \* \*

Devous: Well, yeah, they'll do that stuff. They're just trying to make noise but we're not uh—you know, we have to stick right down that line or else it isn't gonna work. They can make threats, they can threaten, they can do anything they want, but we've got to follow that right down the line. And, you know, you can tell them that you ordered anything you want, it's my responsibility, and I told them that. I take full responsibility. And that's all there is to it. And this— and I told you before, I smell a trap. I smell a trap, and you know this is designed from the very beginning to protect me. That's the reason we're doing this—to protect me.

\* \* \* \* \* \*

Devous: Dawn, you are scared. Dawn, now listen to me. I—how many times do I gotta tell you this? I have got to make this thing look good so I can explain a bunch of Demerol that isn't there, okay? As soon as that's done satisfactorily, then the whole thing gets dropped, okay? I told you Dawn, I will—I will do everything I can to make sure you don't get in

any trouble for this because you're doin' it to help me.

Velikaneye: I'm not worried that I'm gonna get in trouble. That is not what scares me—getting into trouble. They can't do anything to me.

Devous: Well then what do you care?

Velikaneye: I don't want this blot on my record. I don't want to go through town and have everybody feel that I'm in a rehabilitation center on drugs—because of drugs. This town is a mean, vindictive town. I've lived here for 25 years.

\* \* \* \* \* \*

Devous: Dawn, I—I'm gonna take care of you. You know I hope you believe that. Don't let anybody sucker you into saying anything. Tell them you've used drugs, tell them you got it from my office, tell them you ordered it. And then it's over. That's it.

(Tape # 1, Pl.Exh. 13.)

Velikaneye: This—this is the way I feel—even if I did tell them, I still think they're gonna check it out, you know.

Devous: Well what's there to check out? If you give 'em an "IV" bag, they've got all the Demerol.

Velikaneye: I don't wanna give 'em that much.

Devous: Why? That's how much we're missing Dawn, that means you haven't used much. You give them the Demerol. Tell them you've just been passing it in there on these big orders and tell them you're keeping it so it clears me. You're not using it. You give it back to them. You know that's like robbing a bank and giving—givin' 'em back the money. That way they'll believe you.

(Tape # 2, Pl.Exh. 13.)

Although Devous did not object to the admission of the tapes at trial, he does so now, claiming that the admission of a copy without accounting for nonproduction of the original violated the Best Evidence Doctrine. Further, Devous now claims that the original had been tampered with.

---

**2.** These excerpts are taken directly from the tapes. Thus, this is an independent transcript prepared by this Court. The transcript offered

by the prosecution was substantially accurate in these areas. See Pl.Exh. 14 at 6–8, Pl.Exh. 15 at 9.

As a preliminary matter, we note that, since objection to the admission of the tapes was not made below, the "plain error" standard guides our review. Fed.R. Crim.P. 52(b); Fed.R.Evid. 103(d). These rules refer to "plain errors affecting substantial rights." *Id.* This language in turn has been interpreted by the Supreme Court to refer to errors that "are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings," *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936); and "... error so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). *See also United States v. Young,* ⸺ U.S. ⸺, ⸺, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1984); *United States v. Frady, supra,* 456 U.S. at 163, n. 14, 102 S.Ct. at 1592, n. 14.

We hold that there was no "plain error" in admitting the tapes as evidence. We are mindful of the Supreme Court's admonition in *Young* that "[r]eviewing courts are not to use the plain error doctrine to consider trial court errors not meriting appellate review absent timely objection—a practice which we have criticized as 'extravagant protection'" (citations omitted), *United States v. Young, supra,* ⸺ U.S. at ⸺, 105 S.Ct. at 1047; and therefore limit ourselves to the following observations: It is well settled in this circuit that the admissibility of tape recordings that are partially inaudible lies within the sound discretion of the trial court. *United States v. Watson,* 594 F.2d 1330, 1335 (10th Cir. 1979), *cert. denied, sub nom Brown v. United States,* 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979); *United States v. Brinklow,* 560 F.2d 1008, 1011 (10th Cir. 1977). Once the proper foundation is laid, as it was here, R.Supp. Vol. II at 254–258, the tapes were admissible as "duplicates" under Fed.R.Evid. 1001(4) and 1003, notwithstanding Devous' *post hoc* and factually unsupported allegation that the original cassette had been tampered with.

## II.

The Government, on the second day of trial, offered as evidence a transcript of each of the three tapes. Pl.Exh. 14, 15, 16. As foundation for the transcript's admission, Velikaneye testified that she had listened to the tape while assisting in the preparation of the transcript, and that the transcript was accurate as far as she knew. R.Supp. Vol. II at 258.

During the morning recess, defense counsel and the prosecutor met with the judge in chambers. Defense counsel objected to the transcript's admission, arguing that it was "probably inaccurate" because it differed substantially from an earlier transcript that defense counsel had seen in the Government's files approximately one week before trial. R.Supp. Vol. II at 259; Def.Exh. M. This earlier transcript, prepared by a secretary at the U.S. Attorney's office, was incomplete. It ended approximately midway through the first tape, and several audible portions of the tape were not transcribed. Defense counsel had not listened to the tape. R.Supp. Vol. II at 261. His objection that the second transcript was inaccurate was apparently based primarily on the discrepancies between the first transcript, prepared by the U.S. Attorney's secretary, and the second transcript, prepared primarily by Velikaneye. At no time did defense counsel ask to *voir dire* the witness Velikaneye, offer a competing transcript, or move for a continuance so that alleged inaccuracies in the second transcript could be detected and exposed. Nor did counsel request the traditional cautionary instruction[3] that would

---

**3.** An example of such an instruction is given in *United States v. Robinson,* 707 F.2d 872, 878 (6th Cir.1983):

THE COURT: Now, ladies and gentlemen of the jury, before we commence playing of the tape, let me advise you that the tape recordings are received into evidence. The tran-

scripts that you have are being furnished for your guidance. As you listen to the tapes in clarifying portions of the tapes which may be difficult to hear, or to identify speakers. The tapes, however, are evidence in the case and the transcripts are not evidence. If you perceive any variation, you will be guided solely

direct the jurors that the transcripts were only to assist the jury and that the tapes would control over the transcript in the event there was a discrepancy. Later, the transcript was admitted as evidence, over objection by defense counsel that the transcript was inaccurate and not the best evidence. R.Supp. Vol. II at 273.

Defense counsel subsequently conducted a lengthy cross-examination of the witness Velikaneye, but never challenged her foundation testimony with respect to the transcript. Counsel never asked Velikaneye whether her preparation of the transcript was accomplished by listening to the tape itself or by "filling in" (i.e., fabricating) portions where the tape was too inaudible to discern what was actually said. Neither did counsel inquire into Velikaneye's alleged motives to falsify or fabricate Devous' incriminating statements in the transcript.

On appeal, Devous contends that it was reversible error to allow the jury to use the transcript when the tapes were of such poor quality that primary reliance on the transcript was inevitable. Devous emphasizes that *"Substantial and material portions* of the tape between Dr. Devous and informer Velikaneye are so inaudible and unintelligible that the government's attempts to 'transcribe' them with the 'assistance' of Ms. Velikaneye would have to have been nothing short of guesswork, artful composition, or an amazing ability to remember approximately eight month old conversations verbatim." (Emphasis in original.) Brief of Appellant at 20. Devous also points to the fact that none of the customary cautionary measures were taken here. The trial court did not listen to the tapes or examine the transcript before allowing them to go to the jury, and the jury was not warned that the transcript might be less than accurate and to consider the tapes as controlling. Devous relies on *United States v. Robinson,* 707 F.2d 872 (6th Cir.1983), where the court reversed the

defendants' convictions because a tape and transcript had been presented to the jury. The court in *Robinson* found that the tape was so inaudible that the jury, even with the traditional cautionary instruction, was precluded from making an intelligent comparison between the tape and transcript. The court reasoned that the government agents who prepared the transcript must have been relying on their independent recollections of what had been said. The court concluded: "Shepherding hearsay to the jury via the transcripts, without employing traditional safeguards, can be considered nothing less than prejudicial. The better course would have been for the agents involved to testify regarding their recollection of the conversations so that the jury could be afforded an opportunity to assess their credibility." *United States v. Robinson, supra,* 707 F.2d at 878.

In our view, the facts in this case are distinguishable from those in *Robinson.* The tapes in this case, while of poor and variable quality, were certainly not so inaudible that a juror would be precluded from comparing the tapes with the transcript and making an independent decision about the transcript's accuracy. Furthermore, the jury was informed as to Velikaneye's primary role in the transcript's preparation. Defense counsel had the opportunity to cross-examine Velikaneye and expose any inaccuracies, fabrications, improper use of independent recollection, etc. that may have existed. Defense counsel did not do so. The failure can be fairly attributed to calculated trial strategy.

 The admission of transcripts to assist the trier of fact, like the admission of tapes of marginal quality, lies within the discretion of the trial court. *United States v. Watson, supra,* 594 F.2d at 1336; *United States v. Slade,* 627 F.2d 293, 302 (D.C. Cir.1980), *cert. denied sub nom Johnson v. United States,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). Transcripts, like

by the tapes and not the transcripts. Of course, if you don't want to use the transcripts, you are not required to do that either. If you cannot determine from the tape that particular words are spoken, you must dis-

regard the transcripts insofar as those words are concerned. Now, that applies to all tapes in this case and all transcripts used in this case.

other evidence, must be properly authenticated before they can be admitted. Fed.R. Evid. 901(a) provides generally that: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." When a transcript is offered, the authentication question is usually, as it was here, whether the transcript is an accurate rendition of the taped conversation. The testimony of either the stenographer (transcriber) or a participant in the actual conversation that the transcript is correct is sufficient to authenticate. *United States v. Rochan,* 563 F.2d 1246, 1251 (5th Cir.1977). Additionally, this Court has stated that, although a judicial determination of the accuracy of transcripts is not a *sine qua non* of their use, it is a recommended practice in the absence of a stipulation by counsel on the point. *United States v. Watson, supra,* 594 F.2d at 1336 n. 6. The D.C. Circuit has offered a set of guidelines for the use of transcripts which we find useful:

> The ideal procedure for testing accuracy is to have the prosecution and defense attorneys stipulate to a transcript. . . . When they cannot agree as to what is on tape, the second best alternative is for the trial court to make a pretrial determination of accuracy by reading the transcript against the tapes. . . . In either situation the jury receives a transcript, certified as a correct version of the tape. A third alternative is to present the jury with two transcripts, containing both sides' versions, and let the jury determine which is more accurate. . . . In this situation, because no one transcript is presented as 'correct,' the judge 'need not necessarily listen to the tapes or pass on the accuracy of any transcript.' (Citations omitted.) *United States v. Slade, supra,* 627 F.2d at 302 (D.C.Cir.,1980).

■ In the instant case, these procedures were not utilized. The prosecutor presented the transcript for the first time on the second day of trial, and the transcript was given to the jury without a judicial pre-determination of accuracy and without giving defense counsel the time necessary to compare the transcript against the tapes and either to stipulate to accuracy or to offer a competing version. Nevertheless, we hold that it was incumbent on defense counsel to move for adequate time or for appropriate cautionary procedures. Instead, defense counsel stated that the transcript was "probably inaccurate" because it did not match an earlier incomplete transcript. Such was insufficient to create a factual issue on the authentication question. Adequate authentication had been accomplished through the unrebutted testimony of Velikaneye. Thus, the trial court did not abuse its discretion in admitting the transcript.

### III.

Devous contends that reversible error was committed when the trial court failed to cure the prejudicial effect of improper closing argument by the prosecutor. The portion of the prosecutor's closing argument to which Devous refers is as follows:

> [Prosecutor]: He [Devous] is not above the law as he tried to be. With regard to the immunity that was given to Dawn Velikaneye, the production of that tape, the testimony of Dr. Brown, the testimony of Larry Hill, the testimony of Mr. Piaia, the testimony of Mr. Quarve, the fact that the Medical Board of the State of Wyoming was examining Dr. Devous was sufficient for me to believe that what Dawn was saying was true. That does not mean that you should believe it, but I used all of those factors in determining that Dawn should have immunity from prosecution. If you think that's wrong, fine. Hold it against me, don't hold it against the system of justice and don't do justice wrong.
>
> [Defense]: Your Honor, we would object to that as improper argument.
>
> THE COURT: Yes. Summarize the evidence, counsel.

(R.Supp. Vol. III at 543–44.)

■ Devous contends that the prosecutor was improperly placing his own personal belief and credibility at issue, in violation of the proscriptions of *United States v.*

*Latimer,* 511 F.2d 498, 503 (10th Cir.1975). The court sustained the defense's objection. Devous now contends that this was not enough, that the court should have granted a mistrial *sua sponte.* We disagree. Taken in context, the prosecutor was replying to the defense's insinuation in closing argument that Velikaneye should not have been given immunity, R.Supp. Vol. III at 536, by explaining that she had been given immunity because there was sufficient corroborating evidence to support what she was saying. *Cf. United States v. Young, supra.* The prosecutor's remarks about what he believed were on the border. Defense counsel's objection to those remarks was sustained. The trial court's action was proper and sufficient to avoid prejudice to the defendant.

■ Devous contends that the court's instructions to the jury were confusing and incomplete, in that the court did not instruct the jury that the defendant's distribution of Demerol was "outside the course of his professional practice." This contention is incorrect; the court did instruct on this element by reference to the indictment, the full text of which was read to the jury as part of the instructions. R.Supp. Vol. IV at 551. Furthermore, the instructions, although complex, were not unduly confusing. We hold that the instructions were complete and adequately covered each element of the crimes charged.

■ Devous also contends that the evidence was insufficient to convict him on any of the three counts and that the trial court therefore erred in failing to grant his motions for acquittal. The substance of this contention is that the prosecution did not establish that the Demerol involved was not being used for legitimate medical purposes, or that it had been obtained fraudulently. We disagree. There was ample evidence presented that the Demerol was being used for recreational purposes, and that the final purchase of 40 bottles was effected through a false representation that the drugs were needed for a visiting doctor from Salt Lake City.

AFFIRMED.