NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0135n.06

Nos. 20-1491/1492/1515/1522

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Mar 29, 2022 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) |  |
|  | ) | ON APPEAL FROM THE |
| TREMAIN LAMAR BRAXTON (20-1491); | ) | UNITED STATES DISTRICT |
| TIMOTHY ROY MASON (20-1492); DARYL | ) | COURT FOR THE WESTERN |
| KEVIN CANNON (20-1515); DARRELL LEE- | ) | DISTRICT OF MICHIGAN |
| LAMONT SUMMERS II (20-1522), | ) |  |
|  | ) |  |
| Defendants-Appellants. | ) |  |

Before: MOORE, KETHLEDGE, and DONALD, Circuit Judges.

KETHLEDGE, J., delivered the opinion of the court in which MOORE, J., joined in full, and DONALD, J., joined in part. DONALD, J. (pp. 14–17), delivered a separate opinion dissenting from Part II.A.v. of the majority opinion.

KETHLEDGE, Circuit Judge. After a ten-day trial, Tremain Braxton, Timothy Mason, Daryl Cannon, and Darrell Summers II were convicted of crimes relating to a large drug conspiracy. The defendants raise a host of arguments on appeal, attacking both their convictions and their sentences. We vacate Cannon's sentence but otherwise affirm.

I.

In August 2018, law-enforcement agents searched a dozen drug houses and arrested 18 members of a conspiracy to distribute crystal methamphetamine in southwest Michigan. A grand jury thereafter indicted 24 people for participating in the conspiracy, including Braxton, Mason, Summers, and Cannon, each of whom chose to go to trial. The trial lasted ten days.

The government's star witness was Raymond Stovall, a co-conspirator who had pled guilty to charges related to the drug conspiracy and agreed to cooperate with the government.

At trial, Stovall testified that he and his co-conspirators bought crystal methamphetamine in Arizona and California (sometimes traveling by plane and other times sending drugs and cash through the mail) and then sold the meth in Michigan for a large profit. Stovall testified that Summers and Cannon were two of his suppliers and that Mason and Braxton were two of his downstream distributors. Five other co-conspirators likewise testified against the defendants. The government also introduced other evidence—such as intercepted drug packages, shipping records, flight records, phone records, wiretapped phone calls, and text messages—that corroborated their witnesses' testimony. The jury returned a guilty verdict, convicting all four defendants of conspiracy to distribute and to possess with intent to distribute 50 grams or more of methamphetamine. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 846. Braxton, Mason, and Cannon were also convicted of additional crimes arising from the same conspiracy. The district court sentenced Braxton and Mason to 180 months' imprisonment, and Cannon and Summers to 240 months' imprisonment. This consolidated appeal followed.

## II.

We address the defendants' arguments in turn, beginning with their convictions and then turning to their sentences.

### A.

#### i.

Braxton and Mason argue that the district court should have granted their motion to suppress evidence that the government had obtained through a wiretap. While investigating the conspiracy, law-enforcement agents applied for wiretap orders to intercept Stovall's and another

conspirator's communications. The district court entered the orders, and agents intercepted thousands of phone calls and text messages, some of which implicated Braxton and Mason.

To obtain authorization for a wiretap, the government must show both probable cause and necessity. 18 U.S.C. § 2518(3). To establish probable cause, the government must show a fair probability "that an individual is committing" a crime and "that particular communications concerning that offense will be obtained" through the wiretap. *Id.* § 2518(3)(a)–(b). To establish necessity, the government must show that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c).

The defendants argue that the government met neither of these requirements here. We review "the district court's findings of fact for clear error and questions of law de novo." *United States v. Poulsen*, 655 F.3d 492, 503 (6th Cir. 2011).

Probable cause "is not a high bar," and here the wiretap application easily clears it. *Kaley v. United States*, 571 U.S. 320, 338 (2014). The application laid out that officers had conducted nine controlled buys, intercepted drug packages, surveilled Stovall and other conspirators, seized meth from some of the conspirators, listened to a drug-related phone call between Stovall and a prison inmate, and tracked conspiracy-related communications to the two target phones. That was enough to establish probable cause. *See, e.g.*, *Poulsen*, 655 F.3d at 504.

The defendants counter that two confidential informants, a postal worker, and an undercover police officer, each of whom played some part in the investigation, were "unreliable." But the information these sources provided was corroborated by controlled buys, intercepted drug packages, surveillance of conspiracy members, and recorded phone conversations. In addition, in its wiretap application, the government disclosed the "problems with its sources," which allowed

the district court to make its own determination that, though some of the informants "might have credibility problems," others did not. The district court did not err in concluding that the wiretap application established probable cause.

The same is true as to necessity. The affidavit detailed law enforcement's attempts to gain information through informants and its attempts to use an undercover agent. The affidavit also recited the reasons why, at the time, execution of search warrants or other methods of investigation would have been imprudent. True, the wiretap application did not demonstrate the futility of every other investigative procedure; but the government need not "prove that every other conceivable method has been tried and failed" to satisfy the necessity requirement. *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988). Here, the affidavit laid out the normal investigative procedures that police had already attempted and explained why others would be futile. That was enough to establish necessity. *See, e.g.*, *United States v. Young*, 847 F.3d 328, 344–45 (6th Cir. 2017). The defendants' argument is therefore without merit.

ii.

Relatedly, Braxton argues that the district court abused its discretion when it allowed the government to admit recordings of the wiretapped phone calls into evidence and use "transcripts" of the calls as aids at trial. Specifically, Braxton contends that the recorded calls were incomprehensible and that the government's "transcripts" were unreliable.

A party may admit a recording into evidence only if the recording is "sufficiently comprehensible for the jury to consider the contents." *United States v. Wesley*, 417 F.3d 612, 620 (6th Cir. 2005) (internal quotation marks omitted). If a recording contains incomprehensible portions that are substantial enough "to render the recordings as a whole untrustworthy," then the recording is inadmissible. *United States v. Wilkinson*, 53 F.3d 757, 761 (6th Cir. 1995) (internal

-4-

quotation marks omitted). Similarly, a party may use a transcript at trial only if the transcript is reliable. *See United States v. Robinson*, 707 F.2d 872, 875–79 (6th Cir. 1983). If the parties have not stipulated to the accuracy of a transcript, then the court should "make an independent determination of accuracy by reading the transcript against the tape." *Id.* at 878–79. In the end, "the decision to employ recordings and transcripts" rests within "the sound judicial discretion of the trial court." *Id.* at 875.

Here, the district court listened to the recordings and compared them to the transcripts that the government had prepared. The court found that, though the calls were "difficult" to understand "at points," the audio "was pretty clear" during the parts that the government had transcribed. Our own review of the recordings confirms that the audible portions of the recordings were clear enough to submit to the jury and that the incomprehensible portions were not so substantial as to render the whole untrustworthy. Likewise, the transcripts fairly reflected the audible portions of the recorded calls and indicated where the audio was unintelligible. The district court did not abuse its discretion by admitting the recordings into evidence or allowing the jury to read the transcripts during trial.

iii.

Three of the defendants—Braxton, Mason, and Summers—argue that the district court abused its discretion when it denied their emergency motion to adjourn trial. *See United States v. Garner*, 507 F.3d 399, 408 (6th Cir. 2007). A few days before trial, the government produced over 13 gigabytes of "Jencks Act material," including witness interviews, jail phone calls, grand-jury transcripts, and proffer reports. The Jencks Act requires the government to produce any statements made by its witnesses that relate to "the subject matter as to which the witness has testified" and that the government has in its "possession." 18 U.S.C. § 3500(b). The Act requires the

government to produce these statements only after the witness "has testified on direct examination." *Id.* Here, in the district court, the defendants did not argue that the government failed to comply with the Jencks Act. Yet they moved to continue the trial for one week, complaining that they did not have enough time to review the material. The district court denied the motion, noting that the government had produced the material earlier than the Act required, and that the production for the most part comprised only "about 10 hours of audio and video recorded interviews." The court also found that counsel had "plenty of time" to review the material before trial.

A district court has "wide discretion in the scheduling of a trial," which we will not disturb absent "manifest abuse." *United States v. Van Dyke*, 605 F.2d 220, 227 (6th Cir. 1979). Thus, to prevail on appeal, the defendants must show that the denial caused them to suffer "actual prejudice"—meaning, for example, that "additional time would have produced more witnesses" or "added something" to their case. *United States v. Martin*, 740 F.2 1352, 1360–61 (6th Cir. 1984).

The defendants barely attempt to show prejudice here. Summers contends that reviewing the material "necessarily drew his counsel's attention away from other critical trial-preparation tasks." But "inconvenience" alone cannot establish actual prejudice. *Van Dyke*, 605 F.2d at 227. The defendants also say that the short time between production and trial prevented them from reviewing the material "with any meaningful thoroughness." Yet the defendants point to no specific document or recording that they would have used at trial had the trial been adjourned. Indeed, they nearly concede the absence of any prejudice, stating that they "cannot possibly know with certainty what they could have used and in what way they could have used it." And if the defendants in fact had suffered any concrete prejudice as a result of the court's decision, they

presumably would be able to articulate it now. They have not. The district court did not abuse its discretion by denying the motion to adjourn.

iv.

Cannon argues that the district court abused its discretion when it denied his motion for a mistrial. *See United States v. Knipp*, 963 F.2d 839, 844–45 (6th Cir. 1992). The defendants so moved after the district court admonished Prospective Juror 123, a corrections officer, for statements he had made during voir dire. Specifically, Juror 123 said that he "would have a hard time being impartial" because he "deals with felons every day" and that it was in his "best interests for there to be more prisoners just for job security." The district court told him that his answers were "crass" and "really disappointing," given that he held a position of public trust. Soon after, Juror 123 added that, because the four defendants and their family members knew his first and last name and where he worked, the court was "jeopardizing [his] safety" by making him participate in the trial. The district court again criticized Juror 123 for his "disregard for the constitutional norms that we all live by," and then excused him for cause.

On appeal, Cannon argues that Juror 123's comments "poisoned the pool" of prospective jurors. His theory is that, after Juror 123 expressed safety concerns, others on the jury panel would have been scared too, which would have inclined them to find him guilty.

The question whether a jury is fair and impartial "is essentially one of credibility," and the district court's resolution of that question is entitled to "special deference." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (internal quotation marks omitted). Here, the district court observed that, during voir dire, Juror 123 had admitted that he "really" did not want to serve on the jury, which in the courts view tainted his credibility in the minds of the other prospective jurors. Indeed, the court said that the other prospective jurors were "rolling their eyes" at Juror 123's remarks. The

court ultimately found that there had been no "poisoning of the well at all." On this record we see no abuse of discretion in that determination. *See Knipp*, 963 F.2d at 845.

v.

Braxton, Mason, and Summers argue that the district court abused its discretion when it barred them from cross-examining Stovall about child pornography that police had found on his cellphone. *See United States v. Callahan*, 801 F.3d 606, 623 (6th Cir. 2015). By way of background, law-enforcement agents obtained a warrant and searched Stovall's phone after he was arrested in 2018. There they found multiple videos of Stovall engaging in sexual conduct with a 15-year-old female. Although the government questioned Stovall about these videos, Stovall was not charged with any crimes related to them. At trial, the defendants sought to cross-examine Stovall as to any potential "bias" related to the pornography on his phone and any "discussions with the government regarding chargeable conduct." But the district court barred cross-examination on the topic.

The Sixth Amendment affords all criminal defendants the right to cross-examine witnesses about matters especially important to their credibility, such as their potential bias or motive to present false testimony at trial. *See Davis v. Alaska*, 415 U.S. 308, 315–16 (1974). That the government and the witness have some "understanding or agreement as to a future prosecution," for example, is important to the witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972). But a district court retains "wide latitude" to impose reasonable limits on cross-examination. *Callahan*, 801 F.3d at 623 (internal quotation marks omitted). "So long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias," a limitation on cross-examination does not violate the Sixth Amendment. *Id.* at 624 (internal quotation marks omitted).

Here, the defendants had no evidence at all of any agreement between the government and Stovall regarding a potential child-pornography charge. Meanwhile, the jury did know that Stovall had faced a life sentence for his involvement in the conspiracy, which he avoided by means of his plea agreement and testimony at trial. The jury also knew that, even though the government suspected that Stovall had ordered his subordinates to murder two men in connection with his drug dealing, the government had not charged Stovall for the murders. The jury thus already knew that Stovall had ample incentive to testify favorably to the government so as to avoid being charged with future crimes. *See id.* The defendants counter that a conviction for child pornography would bring consequences (e.g., a designation as a sex offender) that Stovall's drug convictions would not. But that concern was marginal, given the indisputably severe consequences that the jury already knew that Stovall was facing as a result of his conduct. Meanwhile, as the district court found, disclosure of the child pornography would have been highly prejudicial and at most only moderately probative of Stovall's credibility as a witness. The district court did not abuse its discretion by limiting the scope of Stovall's cross-examination.

vi.

Mason argues that the prosecutor committed misconduct—namely that he elicited false testimony when Stovall testified that he sold meth to Mason on July 11, 2018. According to Mason, that statement contradicted Stovall's testimony from an earlier trial, at which Stovall said that, on July 11, he had told Antwan Mims that he did not have any meth to sell. Mason also says that Stovall's testimony about the July 11 sale to Mason contradicted the testimony of another co-conspirator, Richard James, who said that he and Stovall were out of meth on July 10 and 11. Mason did not raise this argument in the district court, so we review it for plain error. *See United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006).

To succeed on this claim, Mason must show that the challenged testimony "was actually false." *Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009). And to make that showing, he must demonstrate that the testimony was "indisputably false." *United States v. Lochmondy*, 890 F.2d 817, 822–23 (6th Cir. 1989).

Ample evidence supported Stovall's testimony about the July 11 drug deal. For one thing, police intercepted more than a dozen messages and phone calls between Mason and Stovall, which corroborated Stovall's account of the July 11 deal. Mason does not even attempt to explain what those messages were about, if not a drug deal. For another, when Mason's counsel cross-examined Stovall about the inconsistencies between his testimony at the two trials, Stovall said that he had simply lied to Mims on July 11—because he would have made more money selling the meth to Mason than to Mims. And Mason otherwise points to "mere inconsistencies" in Stovall's testimony, which are not enough to prove prosecutorial misconduct. *Id.* at 822. This claim is without merit.

### vii.

Cannon and Summers each argue that insufficient evidence supported their convictions. We view the evidence in the light most favorable to the government, asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

We begin with Cannon, who argues that insufficient evidence supported his conspiracy conviction. But plenty of evidence tied Cannon to the conspiracy: Stovall testified that he and Cannon traveled to California to buy drugs from Cannon's supplier; flight records confirmed that Cannon had flown to California 17 times in less than two years; and two other conspirators testified about Cannon's involvement in the conspiracy. Moreover, phone records showed that Cannon

communicated with Stovall 118 times and with other co-conspirators at least 111 times. Sufficient evidence supported Cannon's conspiracy conviction.

The same is true as to Cannon's conviction for distribution of methamphetamine: several witnesses testified about Cannon's distribution activities, and we will not second-guess their credibility here. *See United States v. Washington*, 715 F.3d 975, 981 (6th Cir. 2013). Sufficient evidence supported both of Cannon's convictions.

Summers likewise argues that insufficient evidence supported his conspiracy conviction. In his view, the evidence demonstrated only that he "associated" with Stovall and that he sold meth "independently," not that he agreed to join a conspiracy. But Stovall and another co-conspirator testified that Summers and Stovall had traveled together to Arizona to purchase meth. Stovall also testified that he met Summers in California to buy meth on one occasion, and that on many other occasions he sold drugs that he had bought from Summers. Another co-conspirator testified that he had sold over 50 pounds of meth to Summers. The testimony of these co-conspirators, on its own, was sufficient to support Summers's conviction.

B.

We turn to the defendants' arguments about their sentences. Braxton argues that the district court erred in counting his conviction under Mich. Comp. Laws § 333.7401 as a "serious drug offense." 18 U.S.C. § 924(e)(2). But he concedes that our recent decisions in *United States v. Thomas*, 969 F.3d 583, 585 (6th Cir. 2020), and *United States v. Booker*, 994 F.3d 591, 594–96 (6th Cir. 2021), hold otherwise. So we reject that argument here.

Cannon raises three sentencing arguments. First, he argues that the district court clearly erred when it held him responsible for 30 pounds of methamphetamine. *See United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010). A district court may calculate "the amount of drugs

for which a defendant should be held accountable" using only "testimonial evidence from a co-conspirator." *United States v. Hernandez*, 227 F.3d 686, 697–98 (6th Cir. 2000). Cannon admits that Stovall's testimony supports the 30-pound calculation, which is reason enough to reject this argument.

Second, Cannon argues that the district court erred in applying a two-level enhancement for obstructing justice. *See* U.S.S.G. § 3C1.1. At sentencing, the district court explained:

> I think the obstruction enhancement does apply. Obviously anybody has the right to testify, but that doesn't carry the right to commit perjury. And if you get on the stand [and] . . . affirmatively assert "I wasn't involved in this, you know, I didn't do this," when in fact the jury finds beyond a reasonable doubt that you did, and you go even beyond that and are trying to articulate an alternative narrative to explain the evidence about the food truck business, I think there has to be and appropriately is a penalty for that.

A defendant's perjury is ground for a § 3C1.1 enhancement only if the district court identifies the "particular portions of the defendant's testimony that it considers to be perjurious." *United States v. Roberts*, 919 F.3d 980, 990 (6th Cir. 2019) (internal quotation marks omitted). The district court must then either "make specific findings for each element of perjury" or at least make a finding that covers all the elements of perjury (that the defendant made "a false statement under oath" about a "material matter . . . with the willful intent to provide false testimony"). *Id.* at 990–91 (internal quotation marks omitted). These requirements limit the danger that "every accused who testifies at trial and is convicted" receives the enhancement. *United States v. Dunnigan*, 507 U.S. 87, 95 (1993).

Here, the district court simply did not explain the bases for the enhancement with the specificity that *Roberts* requires. The court did not identify any "particular portions" of Cannon's testimony as perjurious. *Roberts*, 919 F.3d at 990. Nor did the court explain how any of his

testimony satisfied each element of perjury. The court therefore did not make the findings necessary to support the obstruction enhancement.

Third, Cannon argues that his 240-month sentence was substantively unreasonable. But given our vacatur of the obstruction enhancement, we decline to consider that argument here. *See United States v. Wilson*, 614 F.3d 219, 226 (6th Cir. 2010).

Finally, Summers argues that the district court clearly erred in finding that he was "an organizer or leader" of the drug conspiracy. *See* U.S.S.G. § 3B1.1(c). The court found that Summers supervised one co-conspirator, Scotty Campbell. The evidence at trial supported that finding: Stovall testified that Campbell was Summers's right-hand man; another co-conspirator testified that Campbell had worked with Summers, that the two were best friends, and that Campbell bought meth from Summers; and ample evidence showed that Summers and Campbell had a close relationship. The district court did not clearly err when it found that Summers supervised Campbell. *See United States v. Sexton*, 894 F.3d 787, 794 (6th Cir. 2018).

\* \* \*

The district court's judgments are affirmed, except that we vacate Cannon's sentence and remand for the district court to determine whether to apply the obstruction enhancement.

BERNICE BOUIE DONALD, Circuit Judge, dissenting in part and concurring in part.

I.

I disagree with the majority that the defendants' impeachment of Stovall eviscerated the need for further cross-examination in line with the Sixth Amendment. I therefore must dissent from Part II.A.v. of the majority opinion.

"At the core of the Confrontation Clause is the right of every defendant to test the credibility of witnesses through cross-examination." *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000). Revealing a witness' bias or motivation to lie plays a vital role in casting doubt on a witness' credibility. *Id.* Thus, "'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)). Accordingly, a trial court may not prohibit a criminal "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness," *id.* at 680, or unduly limit "information concerning formative events . . . of the witness' motives and bias," *United States v. Fields*, 763 F.3d 443, 464 (6th Cir. 2014). Unfortunately, the majority allows the district court to do just that in this case.

I agree that Stovall's testimony underwent various attacks and his credibility resultantly suffered. However, the line of inquiry that the defendants sought to pursue at trial—Stovall's potential motivation to avoid child pornography charges—is of a different character than the other areas of impeachment.

Production of child pornography is a federal crime that entails heavy penalties. *See* 18 U.S.C. § 2251. For instance, production of child pornography carries a mandatory minimum sentence of fifteen-years' imprisonment. *See id.*; *see also United States v. Sweet*, No. 21-1477,

2021 WL 5371402, at *4 (6th Cir. Nov. 18, 2021) (noting that production "carries a far longer sentence than that associated with mere possession"). While that alone may not differentiate it from Stovall's other impeachable conduct, a conviction for child pornography additionally triggers the Sex Offender Registration and Notification Act ("SORNA"), 34 U.S.C. § 20901 *et seq*. SORNA requires offenders to publicly report their name, residential address, and criminal history. *See* 34 U.S.C. § 20914. It also subjects offenders to future criminal liability for failing to register or update their registration. *See* 34 U.S.C. § 20913. Furthermore, it is well known that defendants convicted of child sex crimes face harsh treatment in prison. *See, e.g.,* Brian D. Gallagher, *Now that We Know Where They Are, What Do We Do with Them?: The Placement of Sex Offenders in the Age of Megan's Law*, 7 WIDENER J. PUB. L. 39, 63 (1997) (quoting a prison inmate describing the violence that occurs against child sex offenders in prison); *The Supreme Court, 2002 Term—Leading Cases*, 117 HARV. L. REV. 327, 339 (2003) ("Within the hierarchy of prisons . . . sex offenders in general—and child molesters in particular—are considered the lowest of the low.").

Under these circumstances, the minimal, if any, potential for harassment or embarrassment cannot serve as a basis to preclude this prototypical form of cross-examination. Even if temporary embarrassment exists, it is "outweighed by [the defendants'] right to probe into the influence of possible bias in the testimony of a crucial [government] witness." *Davis*, 415 U.S. at 319. *See id.* at 320 ("[T]he State's desire that [the government's witness] fulfill his public duty to testify free from embarrassment and with his reputation unblemished must fall before the right of [the defendant] to seek out the truth in the process of defending himself.").

To limit a highly pertinent area of cross-examination in a case resting, almost exclusively, on the testimony of a drug conspiracy leader sets a troublesome precedent. For the aforementioned reasons, I respectfully dissent.

-15-

II.

I reluctantly concur in Part II.A.iii. of the majority opinion. I write separately to express my disagreement with the Jencks Act. The Jencks Act is an outmoded means of discovery. Congress passed the Act in 1957, when case complexity, globalization of evidence, and technology did not play a central role in the pretrial process. This is not the case today. Today, the pretrial process is fraught with lengthy, multi-defendant trials and encrypted, digitized discovery. Given the significant change in the judicial process, the Jencks Act is no longer practical or fair.

Allowing the government to strictly follow the timing provision of the Jencks Act would result in substantial judicial disruption. Such late disclosures would require trial judges to routinely continue cases to allow defense counsel the opportunity to review each witness statement prior to cross-examination. Notably, sufficient time to review a witness statement does not necessarily translate to sufficient time to prepare proper cross-examination. Many federal investigations are conducted over an extended period of time with voluminous amounts of information accumulated. When the government releases this information only after a witness has testified, defense counsel is often limited to what the government provided. There is little opportunity for the defense to verify the information or conduct additional searches for pertinent points of cross-examination. Proper cross-examination is crucial in fact-intensive cases, such as this one.

Pretrial discovery of witness statements is necessary to afford a more efficient judicial process, limit the prosecutorial advantage at trial, and guarantee effective assistance of defense counsel. However, under current law, the government can statutorily withhold such statements until after the witness has testified on direct examination. *See* 18 U.S.C. § 3500(a). Braxton,

Mason, and Summers' argument is thus foreclosed by the rigid—and in my opinion impractical—requirements under the Jencks Act.  Therefore, I have no choice but to concur.