7 F.3d 235
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert L. COBURN (No. 92-1413), Chester Coburn (No.
92-1523), and Stanley L. Brown (No. 92-1555),
Defendants-Appellants.
 Nos. 92-1413, 92-1523 and 92-1555.
 United States Court of Appeals, Sixth Circuit.
 Sept. 1, 1993.
 
 On Appeal from the United States District Court for the E.D.Mich., No. 91-80269; Gilmare, D.J.
 E.D.Mich.
 AFFIRMED IN NO. 92-1555, AFFIRMED IN PART, REVERSED IN PART AND REMANDED IN NOS. 92-1523 and 92-1413.
 Before MILBURN, RYAN and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 In these consolidated appeals, defendant Robert L. Coburn (No. 92-1413) challenges the sentence imposed by the district court following his guilty plea conviction to one count of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and one count of unauthorized acquisition of food stamps in violation of 7 U.S.C. § 2024(b)(1); defendant Chester Coburn, Jr. (No. 92-1523) challenges the sentence imposed by the district court following his jury conviction of one count of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1); and defendant Stanley Lewis Brown (No. 92-1555) challenges his jury conviction and sentence for one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, six counts of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), five counts of unauthorized acquisition of food stamps in violation of 7 U.S.C. § 2024(b)(1), and one count of simple possession of cocaine in violation of 21 U.S.C. § 844(a).
 
 
 2
 On appeal, the issues presented by Robert L. Coburn and Chester Coburn, Jr. are (1) whether the district court erred in determining that their base offense level was 18, and (2) whether the district court erred in applying a two-level enhancement for possession of a firearm in relation to a drug trafficking crime pursuant to United States Sentencing Guideline ("U.S.S.G.") § 2D1.1(b)(1). The issues presented by Stanley Lewis Brown are (1) whether the district court erred in permitting the jury to listen to a portion of a tape recording and to read the corresponding portion of a transcript of the recording without ordering the redaction of allegedly prejudicial portions of the transcript; (2) whether the district court erred in denying Brown's motion for a mistrial based upon the testimony of a government informant; (3) whether the district court erred in permitting one of the government's witnesses, Agent Braun, to testify as to what he believed another government witness, Agent Porte, witnessed; (4) whether the district court erred in permitting a government witness to speculate as to whether he could have gone into the D & C Party Store and bought drugs; (5) whether there was credible evidence that defendant possessed any of the weapons seized in the execution of the search warrant for any purpose other than self-defense; (6) whether the district court erred in instructing the jury that the presumption of innocence remains with the defendant "until you are satisfied of his guilt beyond a reasonable doubt"; (7) whether the district court erred in refusing to give a cautionary instruction to the jury that betting slips, stolen cigarettes, and the brandishing of knives did not relate to any of the specific crimes which the defendant was charged with and that the jury should not consider them as evidence; and (8) whether the district court erred in enhancing Brown's offense level by two points for possession of a firearm in relation to a drug trafficking offense under U.S.S.G. § 2D1.1(b)(1). For the reasons that follow, we affirm in part and reverse in part.
 
 I.
 A.
 
 3
 On November 30, 1990, the D & C Party Store ("D & C") became the target of an investigation by the United States Secret Service. Prior to that date, the Secret Service had been jointly investigating party stores in the Flint area with the Michigan State Police.
 
 
 4
 Nicholas Hammock, a government informant since June 1990, provided the case agent, Special Agent Mark Braun, with information regarding narcotic trafficking and the discounting of food stamps at D & C. Robert Coburn was the owner of D & C. Chester Coburn is Robert Coburn's father. Stanley Brown, Robert Coburn's cousin, was employed at D & C. Hammock had a drug problem, and in order to support his habit, he sold stolen cigarettes and "hustled" food stamps at party stores in the Flint area. During the four-year period prior to the investigation, Hammock developed a routine for dealing with the defendants. Generally, after Hammock entered the D & C premises, one of two workers from behind the counter would automatically walk towards the back of the store to meet him. The other worker remained behind the counter operating the store.
 
 
 5
 After he began working with the Secret Service, Hammock continued to use this routine. With Hammock's assistance, the Secret Service was able to purchase cocaine at D & C on eleven occasions using United States Department of Agriculture Food Stamp Coupons, cash, and cartons of cigarettes. The United States Secret Service traced the food stamp coupons and recovered $100 in food stamps which were later redeemed at a Meijers store. The serial numbers from the recovered food stamp coupons matched those provided to Hammock for transactions on January 9, 1991, and January 16, 1991, at D & C.
 
 
 6
 Special Agent Braun testified that on each of the eleven occasions, he met with Hammock prior to entering D & C and just after he left the store. On each occasion the informant and his car were searched and the informant wore a body recorder. The informant was given either a quantity of food stamp coupons or cash or cigarettes to use for the transactions. Tape recordings of ten of the transactions were admitted into evidence at the trial.
 
 
 7
 D & C was also under surveillance while the transactions were being conducted. Each transaction usually took between five and ten minutes. After Hammock left D & C, he was followed to a designated location for a meeting with Secret Service agents. Hammock would give all the contraband he received as a result of the transaction as well as any cash, cigarettes or food stamps not used during the transaction to the agents. The body recorder was removed from Hammock and the tape was marked as evidence. Then, Hammock and his vehicle would again be searched. Finally, Agent Braun would debrief Hammock concerning the transactions, particularly whom he dealt with and the circumstances of each transaction.
 
 
 8
 The first transaction took place on November 30, 1990. Hammock was given $100 in food stamp coupons and twelve cartons of cigarettes which he traded with defendant Stanley Lewis Brown for one gram of crack cocaine. At the second transaction on December 3, 1990, Hammock also dealt with defendant Brown. In exchange for $100 in food stamps and cigarettes, Hammock received 0.75 grams of cocaine and $100 in cash. The tape of this transaction was played for the jury. Hammock also testified that Brown told him that his supply of cocaine was short and that he would look out for him the following day.
 
 
 9
 The next day, December 4, 1990, Hammock went to D & C, accompanied by Adrian Andrews, a Secret Service agent. Andrews, who was carrying $100 in food stamp coupons, entered D & C with Hammock. One of the two men behind the counter, defendant Robert L. Coburn, recognized Hammock and came towards Hammock and Andrews. Following a whispered conversation between Hammock and Coburn, Andrews gave the food stamp coupons to Hammock, and Hammock and Coburn walked to the back of the store. Hammock returned to join Agent Andrews and they left the store. In the parking lot, Hammock gave six rocks of crack cocaine to Agent Andrews. This was one of three transactions in which Agent Andrews and Hammock participated. During these three transactions, Hammock was not out of Andrews' sight.
 
 
 10
 On December 5, 1990, Agent Andrews was present when Hammock traded $100 in food stamp coupons for cash with defendant Brown. Brown placed the food stamp coupons in the D & C cash register. Brown had no cocaine, but he pointed to "Charlie" who was in the back of the store. Hammock used the cash he had received from Brown to purchase one rock of crack cocaine from "Charlie."
 
 
 11
 On December 13, 1990, defendant Robert L. Coburn was working at D & C when Hammock and Agent Andrews entered the store. No transaction occurred on this date because Coburn was short of cash due to an unrelated arrest. After they left D & C, Hammock informed Agent Andrews that because Andrews was unknown to Robert L. Coburn, Coburn did not want to see him back at D & C.
 
 
 12
 Defendant Chester Coburn, Jr. was alone behind the counter on December 10, 1990, when Hammock entered D & C. On this occasion, the transaction occurred over the counter. Hammock traded $150 in food stamp coupons and a case of cigarettes for four rocks [1 gram] of crack cocaine and $80.00 in cash. During the transaction, Hammock argued with Chester Coburn over the size of the rocks of crack cocaine. Subsequently, Chester Coburn pulled out larger rocks of crack cocaine and offered them to Hammock.
 
 
 13
 On December 14, 1990, Hammock was given $100 in cash and $100 in food stamp coupons. Hammock gave the cash and food stamp coupons to Robert Coburn. "Amp," another individual who worked at D & C, gave Hammock five rocks of crack cocaine.
 
 
 14
 On January 9, 1991, another transaction occurred at D & C. The tape of this transaction was played for the jury during Hammock's testimony. Hammock dealt with defendant Stanley Brown at the rear of the store. During the transaction, they argued about whether a food stamp booklet contained $40 or $50, and they bickered about money. Hammock also testified that during the transaction, Brown pulled a jackknife, made statements regarding "sexual acts," and about being in prison. Brown took $150 in food stamp coupons and gave Hammock four rocks of crack cocaine.
 
 
 15
 Transactions also occurred between Hammock and defendant Stanley Brown on January 10, 1991, and January 16, 1991. On January 10, 1991, Hammock traded $150 in food stamp coupons for four rocks of crack cocaine. Defendant Chester Coburn operated the store during this transaction. Eight rocks of crack cocaine were received on January 16, 1991, in exchange for $300 in food stamp coupons.
 
 
 16
 The investigation ended on March 21, 1991, when a federal search warrant was executed at D & C. Earlier that day, Hammock bought one rock of crack cocaine from defendant Stanley Brown for $100 in food stamps and two cartons of cigarettes. Immediately after the conclusion of the deal, Agent Braun entered the D & C premises. He identified defendant Stanley Brown as the individual who was behind the counter.
 
 
 17
 When the search warrant was executed, defendants Chester Coburn and Stanley Brown were behind the counter. Defendant Robert Coburn arrived at D & C during the search. Stanley Brown was in possession of crack cocaine. A razor blade was found on the rim of the sink in the store's rest room.
 
 
 18
 During the execution of the search warrant two firearms were found on the premises. Special Agent Viviano found a loaded 12-gauge shotgun behind the counter and adjacent to the cash register. Special Agent Porte found a loaded .38 caliber revolver located in a box at the end of the counter. The agents also found additional live ammunition for a 12-gauge shotgun, a .38 caliber revolver, and a .22 caliber long rifle in the counter area. In addition, Agent Porte seized a hunting knife that was located underneath the counter near the cash register.
 
 
 19
 Sheila Bausano, an employee of the Food and Nutrition Service of the United States Department of Agriculture, testified at trial. Bausano's job involves the licensing of wholesale and retail organizations to participate in the food stamp program. Bausano testified that D & C was licensed to participate in the food stamp program beginning on September 19, 1985. The food stamp license was effective until January 8, 1990. It was issued to defendant Robert L. Coburn as the owner of D & C.
 
 B.
 
 20
 On March 29, 1991, a federal grand jury returned a twenty-count indictment against defendants Robert L. Coburn, Chester Coburn, Jr., and Stanley Lewis Brown. All three defendants were charged with conspiracy to distribute cocaine, distribution of cocaine, and unauthorized acquisition of food stamps. Stanley Brown was also charged with possession of cocaine and with being a felon in possession of a firearm.
 
 
 21
 On January 6, 1992, pursuant to a Federal Rule of Criminal Procedure 11 plea agreement, Robert L. Coburn pled guilty to the charges in counts four and five of the indictment; namely, distribution of cocaine, and unauthorized distribution of food stamps, respectively. On March 23, 1992, Robert L. Coburn was sentenced to 41 months imprisonment and three years of supervised release. Robert L. Coburn timely appealed.
 
 
 22
 A jury trial of defendants Chester Coburn and Stanley Brown began on January 28, 1992. The trial concluded on February 5, 1992, and the jury returned its verdicts on February 6, 1992. Chester Coburn was found guilty of the charges in count ten of the indictment, distribution of cocaine. Stanley Brown was found guilty on thirteen counts of the indictment, which included one count of conspiracy to distribute cocaine, six counts of unauthorized acquisition of food stamps, and one count of simple possession of cocaine.
 
 
 23
 On April 20, 1992, Chester Coburn was sentenced to 41 months imprisonment and three years supervised release. On April 27, 1992, Stanley Brown was sentenced to 87 months imprisonment, a $1,000 fine, and four years of supervised release.
 
 
 24
 Chester Coburn and Stanley Brown timely appealed. Subsequently, on June 26, 1992, these three appeals were consolidated by this court.
 
 II.
 A.
 
 25
 Defendant Brown argues that the district court abused its discretion in allowing the jury to use a transcript of the tape recorded transaction of January 9, 1991, without redacting the transcript to eliminate statements he made regarding being imprisoned for embezzlement as well as references to sexual acts with white boys while in prison.[1]
 
 
 26
 The decision to admit the tape recordings and the decision to use transcripts of the recordings are matters within the sound discretion of the district court. United States v. Moreno, 933 F.2d 362, 375 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991). Therefore, an abuse of discretion standard is applied to such claims. Id. (citing United States v. Robinson, 707 F.2d 872, 875-76 (6th Cir.1983)). Tape recordings are admissible if they are audible and sufficiently comprehensible for the jury to consider the contents. Robinson, 707 F.2d at 876.
 
 
 27
 The government informed the defendants that the tapes of the December 3, 1990, December 10, 1990, and January 9, 1991, transactions would be played at trial and that the jury would be given transcripts as an aid for listening to the tape recordings. Defendant Brown objected to the accuracy of the transcript for the tape recording of the January 9, 1991, transaction. The district court listened to the tape recordings of the December 3, 1990, December 10, 1990, and the January 9, 1991, transactions. The district judge found that the transcripts of the December 3, 1990, and January 9, 1991, transactions were accurate. However, the district judge found that the quality of the tape recording of the December 10, 1990, transaction was so bad that he could not possibly determine if the transcript were accurate. Accordingly, the district judge informed the government that it could not use the transcript of the December 10, 1990, transaction. In Robinson, this court set forth the standard for determining the accuracy of transcripts of tape recordings:
 
 
 28
 The ideal procedure for testing accuracy is to have the prosecution and defense attorneys stipulate to a transcript. If there is a dispute concerning the contents of the tape, "the second best method is for the trial court to make a pretrial determination of accuracy by reading the transcript against the tapes."
 
 
 29
 707 F.2d at 876 (quoting United States v. Slade, 627 F.2d 293 (D.C.Cir.), cert. denied, 449 U.S. 1034 (1980)). See also United States v. West, 948 F.2d 1042, 1044 (6th Cir.1991), cert. denied, 112 S.Ct. 1290 (1992) (same).
 
 
 30
 In this case, the district court compared the transcript of the January 9, 1991, transaction with the tape recording of the transaction and found that the transcript was accurate. Moreover, when the tape of the January 9, 1991, transaction was played for the jury, the district court also gave two cautionary instructions to the jury. The first was:
 
 
 31
 [W]e are now going to hear a tape and you are being given a transcript of that tape. Now this transcript is not evidence. Only the tape itself is evidence and the transcript is merely being given to you to help you follow the tape and it will be collected as soon as the tape has been played. And, as I say, the transcript itself is not evidence and will not be received in evidence.
 
 
 32
 J.A. p. 432. The second instruction was that:
 
 
 33
 There is one point, members of the jury. On one of the tapes you will hear reference by Mr. Stanley Brown that he had been convicted of embezzlement and been in prison, there is a mention of that. I just want to state that the facts are that Stanley Lewis Brown has never been convicted of embezzlement and has not been in prison.
 
 
 34
 J.A. 436.
 
 
 35
 Thus, in this case, the district court did not abuse its discretion in allowing the jury to use the transcript of the January 9, 1991, transaction as an aid to listening to the tape recording of the transaction. The district court followed the procedure approved by this court for assuring the accuracy of the transcript in the absence of a stipulation by the parties, and the district judge compared the transcript to the tape recording and found that it was accurate:
 
 
 36
 Well, I did hear that, but I am willing to certify this as accurate.... However, I will tell them if you want me to or you can tell them or a stipulation that Mr. Brown has never been convicted of a crime and he has never been in prison and that conversation that they hear on the tape does not indicate that he was so that that is clear.
 
 
 37
 J.A. 100-101.
 
 
 38
 In effect, defendant Brown is arguing that the transcript should have been redacted because it is more prejudicial than probative. See Fed.R.Evid. 403. The decision as to whether evidence is admissible under Rule 403 is left to the sound discretion of the district court. United States v. Castro, 908 F.2d 85, 88 (6th Cir.1990). Moreover, the value of the evidence must be substantially outweighed by its prejudicial character in order to justify exclusion under Rule 403. Id. An appellate court should review the admission of such evidence "in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." Id. (quoting United States v. Zipkin, 729 F.2d 384, 389 (6th Cir.1984). In this instance, when the allegedly prejudicial remarks are viewed in the light most favorable to the government, they are admissible. The statements made by Brown to the government informant, Hammock, during the course of a drug transaction were threats designed to further the drug transaction and drug conspiracy by assuring the buyer of Brown's experience. Furthermore, the district court considered the prejudicial nature of the statements when it offered to and did give a cautionary instruction to the jury that Brown had never been in prison, and, therefore, could not have committed any sexual acts while in prison.
 
 
 39
 Finally, even if we were to assume for the sake of argument that the statements were more prejudicial than probative, in light of the overwhelming evidence against Brown, the failure to redact the statements from the transcript of the January 9, 1991, transaction was harmless error because it appears beyond a reasonable doubt that the statements, based upon the record, "did not contribute to the verdict obtained." See Chapman v. California, 386 U.S. 18, 24 (1967). Here, the jury heard testimony from the government informant concerning Brown's involvement in numerous drug transactions between November 30, 1990, and March 21, 1991. Moreover, the jury heard evidence corroborating Hammock's testimony in the form of the testimony of several Secret Service Agents who were involved in the case as well as tape recordings of some of the transactions.
 
 B.
 
 40
 Defendant Brown also argues that the district court erred in not granting a mistrial as a result of Hammock's testimony regarding a conversation with Brown, in which Brown described "what he used to do to with pretty little white boys in the penitentiary." Appellant's Brief [Brown] p. 39. This conversation is the same one involved in the January 9, 1991, tape recording and transcript. At trial, defense counsel sought a mistrial immediately following Hammock's testimony on the grounds that the government intentionally sought to introduce this evidence. On appeal, Brown argues that the mistrial should have been granted because it was the second time the jury heard that he had been in prison.
 
 
 41
 However, the government did not elicit this testimony from Hammock during direct examination. Hammock made the statements during redirect examination, following cross-examination by defense counsel, during which defense counsel tried to impeach Hammock's testimony by demonstrating that he could not remember the specifics of each of the eleven transactions. On redirect examination, Hammock cited the conversation with Brown as an example of a specific detail which he could recollect. Thus, there is no evidence in the record that the government deliberately sought to elicit this testimony from Hammock.
 
 
 42
 This court was faced with a similar situation in United States v. Martin, 920 F.2d 393, 397 (6th Cir.1990). In Martin, after a tape recording of a conversation was played for the jury, a testifying witness was asked to describe the conversation in his own words. The defendant claimed that allowing the witness to describe the conversation in his own words after the tape was played was error. This court stated:
 
 
 43
 First, the conversation on the tape was between the defendant and a testifying witness and was introduced while the witness was on direct examination. Under such circumstances the witness, if the prosecutor asks, is free to first describe the conversation in his own words and indicate what was said and what occurred. The tape may then be played as corroboration. If the tape is played first, however, it does not mean that a party to that conversation is thereby prohibited from testifying relative to that event.
 
 
 44
 Thus, allowing Hammock to testify concerning the statements which defendant Brown made to him during the January 9, 1991, transaction was not error.
 
 
 45
 Furthermore, the district court did not abuse its discretion in denying Brown's motion for a mistrial following Hammock's testimony. This court reviews the denial of a motion for a mistrial by the district court for an abuse of discretion. United States v. Cameron, 953 F.2d 240, 243 (6th Cir.1992). "A defendant may move for a mistrial where there is a claim of seriously prejudicial error." United States v. Moore, 917 F.2d 215, 220 (6th Cir.1990), cert. denied, 111 S.Ct. 1590 (1991). When reviewing a district court's denial of a defendant's motion for a mistrial, this court is primarily concerned with fairness to the defendant. United States v. Buckley, 934 F.2d 84, 89 (6th Cir.1991). " '[I]f ... the trial was not rendered unfair, [we will not conclude] that the district court ... abused its discretion by denying [the] motion for a mistrial.' " Id. (citation omitted).
 
 
 46
 In this case, defendant Brown cannot demonstrate any serious prejudicial error. As noted above, the admission of Hammock's testimony was not error. Moreover, the jury had already been instructed that Brown had never been convicted of embezzlement and had never been in prison. Therefore, because the trial of Brown was not rendered unfair, the district court did not abuse its discretion in denying the motion for a mistrial.
 
 C.
 
 47
 Defendant Brown also raises three different evidentiary arguments: first, that it was error to allow Agent Braun to testify as to what Agent Porte witnessed; second, that Agent Braun's testimony regarding his ability to purchase drugs at D & C was inadmissible; and third, that the shotgun and hunting knife seized at D & C during the execution of the search warrant were inadmissible.
 
 
 48
 Defendant Brown first argues that it was error to permit Agent Braun to testify as to what he believed Agent Porte witnessed. Brown specifically refers to the point in the trial where Agent Braun testified, "Agent Porte, I believe, saw him [Hammock] leave the store." J.A. 126. In this case, both Agents Braun and Porte testified at trial, and defendant Brown had a full opportunity to cross-examine each of them as to his observations. Further, both agents testified that they were present outside D & C during each of the eleven transactions. Agent Braun was present because he was the case agent, and Agent Porte was present because he was the backup case agent. More importantly, Agent Porte testified that he took a surveillance position at D & C and informed Agent Braun by radio when he observed Hammock enter and exit the store. J.A. 383. Accordingly, the alleged error, if any, in the trial court's ruling was harmless. See, e.g., United States v. Blakeney, 942 F.2d 1001, 1022 (6th Cir.), cert. denied, 112 S.Ct. 646 (1991) and 112 S.Ct. 881 (1992).
 
 
 49
 Second, defendant asserts that it was error for Agent Braun to speculate whether he would have been allowed to purchase narcotics from D & C. In his brief, defendant admits that if this were the only evidentiary error, he would not raise it. Appellant's brief [Brown], p. 41. However, he asserts that this testimony was irrelevant and speculative and that the accumulation of errors in this case is a deprivation of due process.
 
 
 50
 Agent Braun's testimony had some relevance to the case; namely, it was an attempt to demonstrate to the jury the importance of the government informant, Hammock, to the government's investigation of the case. On cross-examination, defense counsel attempted to establish that the informant was unreliable. Moreover, the jury had already heard testimony from Secret Service Agent Adrian Andrews that he accompanied Hammock into D & C on three occasions and that on the third occasion, Chester Coburn refused to deal with Hammock because he did not know Agent Andrews. Thus, the question to Agent Braun was an attempt to show that without the use of the informant, the government could not have investigated D & C. Further, in light of the overwhelming evidence against Brown, the admission of this testimony from Braun, even if speculative, was harmless error.
 
 
 51
 Defendant Brown's final evidentiary challenge is to the admissibility of the shotgun and hunting knife which were seized as a result of the execution of the search warrant at D & C in March 1992. The loaded shotgun and hunting knife, as well as a loaded revolver, were found behind the counter when the search warrant was executed. Defendants Chester Coburn and Stanley Brown were working behind the counter when the warrant was executed. Defendant Robert Coburn, the owner of D & C, arrived during the execution of the search warrant.
 
 
 52
 All three of the defendants were charged with drug trafficking offenses which occurred on the D & C premises. This court has held that weapons found on the premises in drug trafficking cases are admissible, because "[e]xperience on the trial and appellate benches has taught that ... dealers in narcotics keep firearms on their premises as tools of the trade...." United States v. Marino, 658 F.2d 1120, 1123 (6th Cir.1981). Thus, the district court did not abuse its discretion in admitting the weapons.
 
 
 53
 In connection with the above, we note that errors that are not so prejudicial that they amount to a deprivation of due process when considered alone can cumulatively produce a fundamentally unfair trial. United States v. Ashworth, 836 F.2d 260, 267 (6th Cir.1989). However, in giving weight to the cumulative effect of errors, "[w]e must guard against the magnification on appeal of instances which were of little importance in their setting." Id. at 268 (quoting Glasser v. United States, 315 U.S. 60, 83 (1942)). Here, considering the claims of error made by defendant Brown, in light of the entire trial and the overwhelming evidence of guilt contained in the record as a whole, it cannot be said that these alleged errors, which amount to nothing standing alone, have cumulatively produced a fundamentally unfair trial.
 
 D.
 
 54
 Next, defendant Brown challenges the district court's charge to the jury on two grounds: first, he claims that the district court erred when it instructed the jury that the presumption of innocence remained with the defendant until they found him guilty beyond a reasonable doubt. Defendant asserts that the jury should have been instructed that the presumption of innocence remained with him "unless" the jury found him guilty beyond a reasonable doubt. Second, defendant claims that the district court's refusal to give the jury a limiting instruction "regarding betting slips and stolen cigarettes and knives being brandished" was reversible error.
 
 
 55
 First, with regard to the instruction on the presumption of innocence, it does not appear, based upon the record, that defendant has preserved this issue on appeal. The record reflects that the only objection made by the defendant to the district court's jury instructions concerned the failure to give the limiting instruction. Thus, defendant has waived this issue and will not be permitted to raise it for the first time on appeal. See United States v. Willis, 804 F.2d 961, 964 (6th Cir.1986).
 
 
 56
 Moreover, even if defendant Brown had preserved the issue for appeal, it is meritless. This court's standard of review of a district court's jury charge is whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury. United States v. Martin, 740 F.2d 1352, 1361 (6th Cir.1984). A jury charge must be considered in its entirety and not on a sentence-by-sentence basis. United States v. Smith, 584 F.2d 759, 763 (6th Cir.1978), cert. denied, 441 U.S. 922 (1979). A defendant is not entitled to a particular instruction where the instructions adequately and correctly cover the issue. United States v. Townsend, 796 F.2d 158, 163 (6th Cir.1986). In this case, the instruction on the presumption of innocence and the prosecution's burden of proving guilt, beyond a reasonable doubt, adequately covered the issue.
 
 
 57
 Second, defendant Brown claims that the limiting instruction he requested should have been given since "defendant Brown was not charged with any criminal offense involving betting slips, stolen cigarettes or brandishing knives." Appellant's Brief, p. 43. Admission of evidence of prior acts of a defendant's bad conduct under Federal Rule of Evidence 404(b) require the use of limiting instructions cautioning the jury not to consider the evidence for improper purposes. United States v. Yopp, 577 F.2d 362, 365 (6th Cir.1978). However, the evidence concerning cigarettes, betting slips, and the brandishing of knives was not bad acts or other crimes evidence under Rule 404(b). None of this evidence was offered by the government or objected to by the defense as bad acts evidence under Rule 404(b). Rather, the evidence concerning the cigarettes, betting slips, and the brandishing of knives was directly connected to the drug trafficking and food stamp transactions which defendant Brown was charged with.
 
 
 58
 In this case, the cigarettes were used along with the food stamps as "currency" for the purchase of drugs. Further, Hammock, the government informant, placed money on the betting slips because prior to his involvement in the investigation of D & C, he had been using the betting slips when he purchased the drugs, and he continued to do so after he became involved in the investigation so that the defendants would not become suspicious. Lastly, the testimony about brandishing of knives occurred when defendant threatened the government informant in order to convince the informant that he was an experienced drug dealer, thereby furthering not only the conspiracy to distribute narcotics and the distribution of the narcotics but also the unauthorized acquisition of food stamps. Accordingly, because none of the evidence was admitted under Rule 404(b), a limiting or cautionary instruction from the district court was unnecessary.
 
 E.
 
 59
 All three of the defendants argue that the district court erred in enhancing their total offense levels by two levels for the possession of a firearm in connection with a drug trafficking offense under U.S.S.G. § 2D1.1(b)(1). As has been noted previously, when the search warrant was executed on March 21, 1991, two loaded firearms and a hunting knife were seized in the counter area of D & C.
 
 
 60
 Section 2D1.1 provides that if a "dangerous weapon (including a firearm)" was possessed in connection with a narcotics offense, a defendant's offense level should be increased by two levels. U.S.S.G. § 2D1.1(b)(1). The Commentary to that section provides: "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n. 3) (emphasis added).
 
 
 61
 Robert Coburn argues that there was no evidence connecting the firearm to the transaction of December 3, 1990. Defendant Chester Coburn makes the same argument concerning the December 10, 1990, transaction and asserts that because the district court dismissed the felon in possession of a firearm charge against him under Fed.R.Crim.P. 29, the court could not find that he possessed a dangerous weapon in connection with the narcotics offense. Defendant Stanley Brown argues that there was insufficient evidence to show that he possessed the weapons for any purpose other than to protect the store.
 
 
 62
 Where the applicability of an enhancement provision is contested, the government has the burden of establishing the factors leading to the enhancement by a preponderance of the evidence. United States v. Feinman, 930 F.2d 495, 500 (6th Cir.1990). Once the government established that a defendant was in possession of a weapon during the commission of an offense, a presumption arises that such possession was connected to the offense. United States v. Sanchez, 928 F.2d 1450, 1460 (6th Cir.1991). Such possession may be actual or constructive. United States v. Snyder, 913 F.2d 300, 304 (6th Cir.1990), cert. denied, 498 U.S. 1039 (1991).
 
 
 63
 Once the government has established that a defendant possessed a weapon during the commission of an offense, the burden then shifts to the defendant to show that it was clearly improbable that the weapon was connected to the offense. United States v. Duncan, 918 F.2d 647, 651 (6th Cir.1990), cert. denied, 111 S.Ct. 2055 (1991).
 
 
 64
 This court may not disturb a district court's finding that a defendant possessed a firearm during the commission of an offense unless such finding is clearly erroneous. United States v. Moreno, 899 F.2d 465, 470 (6th Cir.1990). However, a conjecture that a defendant possessed a firearm during a transaction does not support an enhancement under § 2D1.1(b)(1). United States v. Brown, 946 F.2d 1191, 1199 (6th Cir.1991). Furthermore, a district court may apply the § 2D1.1 enhancement even where a defendant has been acquitted of a firearms carrying charge because the acquittal on the firearms carrying charge leaves ample room for a finding by the district court that the weapon was possessed during the drug offense. Duncan, 918 F.2d at 652.
 
 
 65
 In addition, it is the presence of the gun which triggers the enhancement. United States v. Almonte, 952 F.2d 20, 25 (1st Cir.1991), cert. denied, 112 S.Ct. 1776 (1992). Thus, even where a gun is present in a store primarily for purposes of protection, the enhancement may be applied if a drug transaction occurs in the store because it is not clearly improbable that the drug dealer would also use the weapon during the drug transaction if the dealer thought it necessary. Id. The key is whether the placement of the gun or guns suggests they would be quickly available for use in an emergency. Snyder, 913 F.2d at 304. See also United States v. Morrow, 977 F.2d 222 (6th Cir.1992) (en banc), cert. denied, 61 U.S.L.W. 3834 (U.S. June 14, 1993) (No. 92-8222).
 
 
 66
 In Morrow, the defendants were arrested by United States Forest Service agents while they were harvesting plants from a marijuana patch. One of the defendants wore a side arm. Id. at 224. The defendant testified that he wore the firearm to protect himself from snakes. This court stated, however, that even if the firearm were worn to protect the defendant from snakes, it could be inferred from the presence of the firearm that it was also carried to facilitate the crime. Id. at 231. Furthermore, this court stated that it could be inferred that the other defendant had knowledge of the firearm where he observed the co-defendant strap on the firearm. Id. at 231. In this case, the firearms were present beneath the counter at D & C. Since the defendants argued that the firearms were present for protection, it can be readily inferred that they had knowledge of the presence of the firearms. Moreover, since the defendants worked behind the counter at one time or another when drug transactions occurred in the store, it can also be inferred that they were aware that the firearms were available during the drug transactions.
 
 
 67
 In this case, the two guns were located near the cash register at D & C on March 21, 1991. Both of the guns were loaded and the shotgun was also cocked as well. Thus, the guns were readily available in case of an emergency. The government informant purchased cocaine from defendant Brown on March 21, 1991, and, when the search warrant was executed, Brown was found to be in possession of more cocaine. Brown was convicted of thirteen counts including distribution of cocaine on March 21, 1991, at D & C and conspiracy to distribute cocaine from November 30, 1990, until March 21, 1991. Thus, the district court properly applied the enhancement to defendant Stanley Brown.
 
 
 68
 However, with regard to both Robert L. Coburn and Chester Coburn, the situation is different. In this case, Robert L. Coburn pled guilty to the charges in counts four and five of the indictment which involved the drug transaction on December 3, 1990. Chester Coburn was found guilty of the charges in count ten of the indictment which involved the drug transaction on December 10, 1990.
 
 
 69
 When the government agents executed the search warrant on March 21, 1991, the three guns, two handguns and a shotgun, were present on the D & C premises. Although the defendants testified that the weapons were for protection, there is no evidence in the record which would show that the weapons were present at D & C prior to March 21, 1991. More specifically, there is no direct evidence that the weapons were present at D & C on either December 3, 1990, or December 10, 1990. Consequently, we find that the government failed to establish, by a preponderance of the evidence, the factors necessary to sustain the application of the two-level enhancement under U.S.S.G. § 2D1.1 to either Robert L. or Chester Coburn. Thus, the district court erred in applying the enhancement to their sentence.
 
 F.
 
 70
 Finally, both defendants Robert and Chester Coburn assert that the district court erred in determining that their base offense level was 18.
 
 
 71
 With regard to Robert Coburn, the government entered into a stipulation with him at the time of his Rule 11 plea agreement which stated that the total amount of crack cocaine which he distributed during the time period covered by the indictment was 1.01 grams. In the Controlled Substance and Quantity Table set forth in U.S.S.G. § 2D1.1(c), crack cocaine is the same as cocaine base. The table states that the base offense level for at least 1 gram of cocaine base but less than 2 grams of cocaine base is 18. In the absence of the stipulation with the government, the total amount of crack cocaine which could have been attributed to Coburn under the relevant conduct provisions of U.S.S.G. § 1B1.3 is in excess of 5 grams, which would have resulted in a base offense level of 26. Thus, the district court's finding that defendant Robert Coburn's base offense level was 18 was not only not erroneous, it was also beneficial to him.
 
 
 72
 With regard to defendant Chester Coburn, he was convicted of distributing cocaine in the December 10, 1990, transaction which involved .63 grams of crack cocaine, resulting in a base offense level of 16. Chester Coburn was also accused of participating in the January 16, 1991, transaction, but was acquitted of aiding and abetting in that transaction by the jury. If the cocaine from the January 16, 1991, transaction were attributed to Chester Coburn under the relevant conduct provision, the amount of crack cocaine attributed to him would be in excess of 1 gram, resulting in a base offense level of 18. Defendant Chester Coburn argued before the district court that since he was acquitted of aiding and abetting in the January 16, 1991, transaction, the district court could not attribute the cocaine from that transaction to him as relevant conduct for sentencing purposes. The district court found:
 
 
 73
 In this case the evidence was that Mr. Coburn was in the store at the time of the sale. He was charged with aiding and abetting on January 16, 1991, and was acquitted, but the evidence shows that he was in the store, that he was tending the store and the counter while Mr. Brown [co-defendant Stanley Brown] conducted and carried on the sale for which Mr. Brown was convicted in the back of the store. I think that is sufficient to invoke the provisions of 1B1.3. I think that I can find aiding and abetting there even though the jury acquitted him. Of course, the jury has the standard beyond a reasonable doubt. I don't have that standard here.
 
 
 74
 J.A. 493-94.
 
 
 75
 "The law in this Circuit is clear that a base offense level is determined by the amount of drugs included in the defendant's relevant conduct, not just amounts in the offense of conviction or charged in the indictment." United States v. Davern, 970 F.2d 1490, 1494 (6th Cir.1992) (en banc), cert. denied, 113 S.Ct. 1289 (1993). "The commentary to Sec. 2D1.1 as well as an interpretation of the words of Secs. 1B1.2(a) and 1B1.3 ("relevant conduct"), can only mean that a judge can take all conduct into account in sentencing--not just the conduct supporting a specific conviction." United States v. Ykema, 887 F.2d 697, 700 (6th Cir.1989), cert. denied, 493 U.S. 1062 (1990).
 
 
 76
 In this case, defendant Chester Coburn was convicted of selling crack cocaine to the government informant on the D & C premises in the January 10, 1991, transaction. Moreover, there was testimony that Chester Coburn was frequently present at D & C. Further, the evidence was that Chester Coburn was present at D & C and working behind the counter at the time of the January 16, 1991, transaction and that Chester Coburn, who had previously sold crack cocaine to the informant, continued working behind the counter and operating the party store so that his co-defendant, Stanley Brown, could sell crack cocaine to the government informant on that occasion. Given this evidence, the district court's finding that the amount of crack cocaine distributed during the January 16, 1991, transaction should be attributed to Chester Coburn as "relevant conduct" is not clearly erroneous because there is a preponderance of the evidence supporting the district court's finding that Chester Coburn aided and abetted the January 16, 1991, transaction.
 
 III.
 
 77
 For the reasons stated, the judgment of the district court with regard to defendant Stanley Lewis Brown is AFFIRMED. The district court's judgments of sentence concerning defendants Robert L. Coburn and Chester Coburn, Jr., are AFFIRMED regarding their claims that the district court erred in determining that their base offense level was 18; however, the district court's application of the two-level enhancement under U.S.S.G. § 2D1.1 to Robert L. Coburn and Chester Coburn, Jr., is REVERSED and the cases of Robert L. Coburn and Chester Coburn, Jr. are REMANDED for resentencing consistent with this opinion.
 
 
 
 [1]
 Although defendant Brown argues on appeal that the district court should have spliced the tape recording of the transaction to remove the references to imprisonment and sexual acts committed while in prison, defendant did not seek to have the district court splice the tape; rather at trial, defendant sought only to redact from the transcript the alleged prejudicial statements. J.A. 101. Thus, on appeal Brown has waived any possible issue as to the splicing of the tape