# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 18, 2012 Session

## STATE OF TENNESSEE v. ERICA HARRIS

**Appeal from the Criminal Court for Knox County**
**No. 93165      Bob R. McGee, Judge**

**No. E2012-01107-CCA-R3-CD - Filed March 25, 2013**

The defendant, Erica Harris, appeals her Knox County Criminal Court jury conviction of the sale and delivery of .5 grams or more of cocaine, claiming that the trial court erred by admitting certain evidence in violation of Tennessee Rule of Evidence 404(b) and evidence of poor quality in violation of Tennessee Rule of Evidence 403 and that admission of a map violated her constitutional right to confront the witnesses against her. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Erica Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilbur, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant's conviction arose from a controlled drug purchase on August 24, 2009. At trial, 27-year-old Francis Brady, who testified that she had a history of drug abuse and drug-related criminal convictions, said that she became an informant for the Knoxville Police Department ("KPD") in 2007 after discussing it with an officer that attended her church. For the controlled buy involving the defendant, she was searched and fitted with a recording device before traveling to a residence on New Street in the Austin Homes community. She said that before the August 24, 2009 transaction, she had seen and

interacted with the defendant "[a] good five or six times," that she was familiar with the defendant's apartment, and that she knew both of the defendant's sons, Darius and "Zonfo." Ms. Brady explained that she had arranged to purchase drugs from Zonfo on a previous occasion.

According to Ms. Brady, the plan on August 24, 2009, was for Ms. Brady to go to the defendant's residence and purchase crack cocaine from "just whoever was in the residence." When she arrived, the defendant let her into the apartment, and Ms. Brady described what happened next:

> I told her I needed a $100 worth of crack cocaine, and she had gone in the kitchen and brought back a DVD which had several rocks on it. And she had said that it was her son's dope that she didn't know if she could give it all to me, so she had got him on the phone and tried to call him and he didn't answer the phone.

At that point, the defendant told her she "could have all the dope that was on top of the . . . DVD case." Ms. Brady said that she agreed because she "thought it was pretty big. It was a little over a hundred dollars worth." She said that the defendant gave her "a bread wrapper off of bread," and Ms. Brady packaged the cocaine herself. Ms. Brady then gave the defendant $100.

An audio recording of the transaction was played for the jury over the defendant's objection. The recording, which was included in the record on appeal, is largely unintelligible. A woman other than Ms. Brady identified herself as "Erica" on the recording. Ms. Brady identified the defendant as the woman with whom she interacted during the recorded transaction.

During cross-examination, Ms. Brady said that the use of street names and false identities was common in the illegal drug trade.

KPD Officer Michael Geddings testified that he supervised Ms. Brady in her role as a confidential informant and explained the procedure for conducting controlled drug purchases. He explained that confidential informants are paid in cash for each controlled buy they complete if they are "not working off charges." Officer Geddings testified that on August 24, 2009, Ms. Brady made him aware of "drug activity at an apartment . . . in the Austin Homes community," telling him that she had purchased drugs from a black male named Zonfo and that Zonfo's mother, Erica Harris, was present during the transaction. Although Ms. Brady did not know the apartment number, she did know the location. With the assistance of Google Earth, Officer Geddings was able to determine the address.

-2-

Through further investigation, he confirmed that the address was the defendant's residence. Officer Geddings testified that he showed the defendant's driver's license photo to Ms. Brady, who confirmed that the defendant was the woman named Erica that Ms. Brady knew to live in the New Street apartment. Officer Geddings testified that he fitted Ms. Brady with recording equipment and "instructed [her] to attempt to purchase a hundred dollars worth of crack cocaine from . . . the apartment . . .that she had identified and that we had identified as 1116 West New Street, apartment number 295." He described what happened upon their arrival at 1116 West New Street:

> [Ms. Brady] exited and then walked into the apartment through the front door, was in there approximately a little over two minutes and then exited through the same door. At which time, she got back into the vehicle, handed me the crack cocaine that had been purchased and then we drove back to the police department.

At the police department, Ms. Brady was searched and instructed to provide a written statement while Officer Geddings weighed, photographed, and field tested the drugs for the presence of cocaine. After the field test was positive, Officer Geddings placed the drugs into an evidence envelope and sent it to the Tennessee Bureau of Investigation ("TBI") laboratory for testing. Officer Geddings identified the defendant's voice on the audio recording of the transaction after noting his familiarity with it.

During cross-examination, Officer Geddings testified that information gleaned during his investigation led him to believe that Tramell Harris, the defendant's son, was in charge of all drug sales taking place in the residence.

KPD Officer Joshua Schaffer testified that he assisted Officer Geddings in the execution of a search warrant at the defendant's residence on September 15, 2009. During the search, Officer Schaffer detained the defendant. After he provided her with *Miranda* warnings, the defendant told Officer Schaffer that "the crack she had sold . . . was her son's and that her son was the one that obtained the crack cocaine and that if he was not there on that occasions she sold." Officer Schaffer conceded that the defendant did not specify a time frame for when she sold drugs.

TBI Agent and Forensic Scientist Carl Smith testified that he tested the rock-like material sent by Officer Geddings and determined it to be .9 grams of crack cocaine.

Knoxville Geographic Information Systems ("KGIS") Analyst Garrett McKinney testified that, at the request of the State, he utilized geographic data available from

various governmental entities to create a map showing the defendant's residence and its proximity to the Green Magnet Elementary School. He also highlighted a 1,000 foot "buffer" from the school's parcel boundary. Using available data, Mr. McKinney calculated the distance between the "exterior parcel boundary of the Green Magnet School" and the defendant's apartment as 597 feet.

During cross-examination, Mr. McKinney acknowledged that he did not personally measure the distance between the defendant's residence and the school's boundary and that all KGIS maps come with a disclaimer that "KGIS makes no representation or warranty as to the accuracy of this map and its information to fitness for any – or for use." He said that it was not possible that the measurements were more than 400 feet wrong.

Following Mr. McKinney's testimony, the State rested, and the defendant presented the testimony of the defendant's son, Tramell Harris. Mr. Harris testified that on August 24, 2009, he lived at 1116 New Street with the defendant, his siblings, and his mother's husband. The defendant, he said, held two jobs, one with "GC Service" and one as a care giver for an elderly woman, while he sold cocaine out of the New Street residence. Mr. Harris acknowledged that he had pleaded guilty in juvenile court to the possession of cocaine. Mr. Harris testified that his aunt, Andrea Johnson, stayed with the family in August 2009 and that Ms. Johnson used and sold crack cocaine.

During cross-examination, Mr. Harris acknowledged that he sold crack from the residence the entire time he lived there and that, although his aunt sold crack cocaine on occasion, he was the primary source of cocaine in the household. He said that he kept the crack cocaine in a closet, sometimes the closet in his bedroom and sometimes the "downstairs" closet. Mr. Harris conceded that execution of a search warrant at the home on September 15, 2009, resulted in the discovery of cocaine in the defendant's bedroom closet. Mr. Harris said that he placed the cocaine in his mother's closet because he "was leaving." Mr. Harris acknowledged that he had no personal knowledge whether the defendant sold crack cocaine to Ms. Brady on August 24, 2009, because he was not home. Mr. Harris conceded that the defendant knew that he sold drugs, but he claimed that the defendant tried to stop him.

Following this testimony, the defense rested, and the State presented rebuttal testimony from the defendant's sister, Andrea Johnson Drury, and Ms. Brady. Ms. Drury denied any involvement in the sale of cocaine. She said that she had seen Ms. Brady on those occasions that Ms. Brady purchased drugs from the defendant and Mr. Harris. Ms. Brady denied having purchased drugs from Ms. Drury.

From this evidence, the jury convicted the defendant as charged of the sale and

delivery of more than .5 grams of cocaine. The trial court merged the convictions and imposed a single sentence of 17 years' incarceration. Following the denial of her timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the trial court erred by admitting into evidence the defendant's admission that she had sold cocaine in the past and evidence that cocaine was discovered in her bedroom because both the admission and the discovery were inadmissible bad act evidence. She also contends that the quality of the audio recording of the controlled purchase was so poor that it should not have been admitted into evidence. Finally, the defendant asserts that admission of a map created by a compilation of measurements from several sources without those sources being available for cross-examination violated her constitutional right to confront the witnesses against her. We consider each claim in turn.

## I. Bad Act Evidence

The defendant avers that the trial court erred by admitting evidence of her other bad acts in the form of her admission that she had sold cocaine "in the past" and proof that cocaine was discovered in her closet during a search of her home that was unrelated to the charges in this case. The State contends that the trial court did not err.

Tennessee Rule of Evidence 404 provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Before such evidence may be admitted, however, the following procedure must be followed:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

## A. Admission

While she was detained during the execution of a search warrant at her residence on September 15, 2009, the defendant told Officer Schaffer that "the crack she had sold . . . was her son's and that her son was the one that obtained the crack cocaine and that if he was not there on that occasion she sold." The defendant objected to the admission of this statement as evidence of a prior, uncharged bad act. The State argued that the statement, taken only weeks after the controlled buy orchestrated by Ms. Brady on August 24, 2009, was direct evidence of the defendant's guilt. The trial court agreed with the State and admitted the statement.

The defendant's admission did not include a time frame for when she had sold drugs on behalf of her son, but even if the temporal proximity of the admission to the offense on trial does not suggest that the admission related to the August 24, 2009 transaction, any error in admitting the evidence is harmless given the other proof in the case.

## B. Cocaine

The defendant contends that the trial court erred by permitting the State to introduce evidence that crack cocaine was discovered in the defendant's bedroom closet during the execution of a search warrant on September 15, 2009. The State argued at trial that the evidence was admissible as proof of identity, a purpose generally allowed under the rules of evidence. On appeal, the State also argues that the evidence was admissible to impeach Mr. Harris's claim that all drugs found in the home belonged to him and that he stored them elsewhere.

Again, evidence that cocaine was discovered in the defendant's closet during the execution of a search warrant does not qualify, in this instance, as the type of evidence prohibited by Rule 404(b). Initially, the proof was admitted to impeach claims made by Mr. Harris about his own possession and storage of cocaine within the home and not to show the defendant's propensity to commit drug crimes. The State solicited testimony that Mr. Harris was charged with possession of cocaine relative to the September 15, 2009 discovery and that he pleaded guilty in the juvenile court to possessing the cocaine discovered in the defendant's closet. The State also argued that the cocaine discovered in the defendant's closet was not evidence of another bad act but evidence of her guilt for the offense on trial, pointing out that the cocaine was stored in exactly the same way as recounted by Ms. Brady. In our view, the evidence was admissible to corroborate Ms. Brady's testimony regarding the condition of the cocaine when given to her by the defendant. The trial court did not err by admitting this

evidence.

## C. Defendant's Right to Testify

Finally, the defendant argues that the trial court's erroneous admission of the defendant's other bad acts "had a chilling effect" on her right to testify. The State contends that the defendant was not deprived of the right to testify and that, because she failed to make an offer of proof, she has failed to demonstrate any prejudice from the trial court's rulings.

As discussed more fully above, this evidence was not subject to exclusion by Rule 404(b). Because the trial court did not err by admitting the evidence, we cannot say that its admission impermissibly infringed on the defendant's right to testify.

## II. Audio Recording

Citing *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983), the defendant sought exclusion of both the audio recording of the controlled drug buy and the transcript prepared by the State on grounds that the quality of the audio recording of the controlled drug purchase was so poor as to render the recording inadmissible under Tennessee Rule of Evidence 403. On appeal, the defendant concedes that *Robinson* "is not the law in Tennessee" and does not advocate for its application here. She reiterates her claim, however, that both the recording and the transcript should have been excluded under Rule 403 because of the "high danger for unfair prejudice" and "the strong risk that the recording" could have misled the jury. The State contends that the trial court did not err by admitting the recording.

The audio recording, included in the record on appeal, is indeed of very poor quality. Voices of two women and at least one man, possibly two, are barely audible over the static associated with the equipment being hidden inside Ms. Brady's clothing and the very loud barking of a dog throughout a great deal of the transaction. The quality is so poor, in fact, that we question its relevance as to the defendant's guilt. *See* Tenn. R. Evid. 401. That being said, at one point in the recording, a woman is heard to identify herself as "Erica," corroborating Ms. Brady's claim that it was the defendant who sold the cocaine to her. Thus, the recording was arguably probative of the defendant's guilt, and we cannot say that the probative value of the recording was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). As to the defendant's claims regarding the transcript, the trial court instructed the jury that the transcript was not evidence but merely

a guide to its consideration of the recording. *See State v. Walker*, 910 S.W.2d 381, 395 (Tenn. 1995) ("The procedure employed by the trial court accompanied by the instructions which were delivered to the jury were sufficient to inform the jury on their duty in reference to the evidence."). The defendant is not entitled to relief on this issue.

*III. Map*

In her remaining claim, the defendant contends that the admission of the map created by Mr. McKinney violated her right to confront the witnesses against her because the State failed to produce those witnesses whose data was used to create the map. The State asserts that admission of the map did not violate the defendant's confrontation rights because the map was not testimonial and because the trial court appropriately took judicial notice of the map.

At trial, the defendant objected to admission of the map on grounds that it violated her right to confront the witnesses against her, arguing that permitting Mr. McKinney to relate to the jury "what others have compiled . . . prevents us from confronting the people who actually created the measurements which means that we are unable to confront the people who are generating the evidence that is an element of this offense." The State responded that the map was admissible because it was based upon public records. The trial court admitted the map over the defendant's objection, observing:

> [T]his is actually a matter that could probably be introduced and the Court could take judicial notice of it. As it is a matter readily and accurately determinable, it's not subject to reasonable dispute. Anybody could take a measuring tape out there and actually measure the distance between two geographic things. The witness here is actually the face of the earth. This is simply a matter of measurements being taken. This appear to be – it would appear that the – what the defend – what the witness is going to be called upon to talk about are matters that would not be excluded involving quotations, tabulations list, directories, other published compilations generally used and relied upon by the public or by persons in particular occupations.

The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court "'has largely adopted the standards used by the United States

Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'" *State v. Parker*, 350 S.W.3d 883, 897-98 (Tenn. 2011) (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006)); *see also State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007).

In *Crawford v.Washington*, the United States Supreme Court departed from decades-long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* In *Crawford*, the Court laid the groundwork for what came to be known as "the primary purpose" test for distinguishing testimonial statements from non-testimonial statements. The Court refined the test in later opinions:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). The Court noted that objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or non-testimonial. *Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011).

In *Melendez-Diaz v. Massachusetts*, the Court moved beyond the realm of interrogation to consider whether "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine" were testimonial and thus subject to exclusion as violative of the Confrontation Clause. *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2530 (2009). The Court answered that question in the affirmative, concluding that "not only were the affidavits 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' but under Massachusetts law the sole purpose of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." *Id.* at 2532 (citations omitted). The court held that "[a]bsent a showing that the analysts were unavailable to testify at trial and that [the accused]

had a prior opportunity to cross-examine them, [the accused] was entitled to 'be confronted with' the analysts at trial." *Id.* (quoting *Crawford*, 541 U.S. at 54). Concluding that live confrontation of the witness by the accused was the only constitutionally permissible way "to challenge or verify the results of a forensic test," the Court observed that confrontation would serve to "weed out" both fraudulent and incompetent forensic analysis. *Id.* at 2536-37. The Court rejected the argument that reports of forensic testing were admissible as business records and that all business records were exempted from the ruling in *Crawford*, explaining, "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because--having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial--they are not testimonial." *Id.* at 2539-40.

The Court elaborated on the *Melendez-Diaz* ruling in *Bullcoming v. New Mexico*. In *Bullcoming*, the prosecution introduced the results of forensic testing via the testimony of a forensic analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample." *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2709 (2011). The Court declared that such a procedure violated Bullcoming's confrontation right, holding, "As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *Id.* at 2713. The Court rejected the argument that substitute testimony satisfied the constitutional requirement because of the reliable nature of the tests themselves, explaining that "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Id.* at 2715 (quoting *Melendez-Diaz*, 129 S. Ct. at 2537). Emphasizing as it did in *Crawford* that "'[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts,'" *id.* at 2716 (quoting *Crawford*, 541 U.S. at 54), the Court observed that it was not "'the role of courts to extrapolate from the words of the [Confrontation Clause] to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values,'" *id.* (quoting *Giles v. California*, 554 U.S. 353, 375 (2008)), and held that the Confrontation Clause "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination," *id.*

Most recently, the Court revisited the rulings in *Bullcoming* and *Melendez-Diaz* in *Williams v. Illinois*, and confronted the issue framed by Justice Sotomayor in her concurring opinion in *Bullcoming*, that is "'the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves

admitted as evidence.'"  *Williams v. Illinois*, 132 S. Ct. 2221, 2233 (2012) (quoting *Bullcoming*, 131 S. Ct. at 2722).  Writing for a plurality that included Chief Justice Roberts and Justices Kennedy and Breyer, Justice Alito concluded that testimonial statements admitted solely for the purpose of explaining the opinion reached by an expert witness are not barred by the Confrontation Clause because they are not admitted for the purpose of proving the truth of the matter asserted.  *Id.* at 2240.  Justice Alito also concluded that the evidence at issue in *Williams*, expert testimony that DNA evidence extracted from semen in the victim's vagina matched a DNA profile for Williams, did not violate the Confrontation Clause because neither DNA profile created and compared by the expert at issue was "prepared for the primary purpose of accusing a targeted individual."  *Id.* at 2243.  Instead, the "primary purpose" of the profile created using the sample from the victim's vaginal swabs "was to catch a dangerous rapist who was still at large, not to obtain evidence for use against [Williams], who was neither in custody nor under suspicion at that time."  *Id.*

In a separate opinion joined by Justice Thomas, Justice Breyer adhered to his position that "experts may rely on otherwise inadmissible out-of-court statements as a basis for forming an expert opinion if they are of a kind that experts in the field normally rely upon" without tendering the evidence for admission or calling as a witness the maker of those statements and still not run afoul of the Confrontation Clause.  *Id.* at 2246 (Breyer, J., concurring).  Noting the practical considerations attendant to abandoning this traditional rule, Justice Breyer observed:

> Once one abandons the traditional rule, there would seem often to be no logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call all of the laboratory experts who did so.  Experts--especially laboratory experts--regularly rely on the technical statements and results of other experts to form their own opinions.  The reality of the matter is that the introduction of a laboratory report involves layer upon layer of technical statements (express or implied) made by one expert and relied upon by another.

*Id.*  Justice Breyer stated that he "would consider reports such as the DNA report . . . presumptively to lie outside the perimeter of the Clause as established by the Court's precedents."  *Id.* at 2251.

Writing solely for himself, Justice Thomas concluded that the reports at issue did not run afoul of the Confrontation Clause because they "lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause."  *Id.*

at 2255 (Thomas, J., concurring in the judgment only).  Justice Thomas did not agree with "the plurality's flawed analysis" regarding the allegedly nonhearsay purpose of the reports because, he said, "there was no plausible reason for the introduction of Cellmark's statements other than to establish their truth."  *Id.* at 2255, 2256.  He observed, "[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose.  There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth."  *Id.* at 2257.

Justice Kagan, in an opinion joined by Justices Scalia, Ginsburg, and Sotomayor, concluded that the evidence at issue was testimonial, was offered for its truth, and, despite being clothed as evidence relied upon by an expert, ran afoul of the Confrontation Clause.  Justice Kagan emphasized that Justice Alito's opinion represented a "plurality" only in "its disposition" because "[f]ive Justices specifically reject every aspect of its reasoning and every paragraph of its explication."  *Id.* at 2257 (Kagan, J., dissenting).  Noting the similarity of the case to that presented in *Bullcoming* and *Melendez-Diaz*, *see id.* at 2267 ("Have we not already decided this case?"), Justice Kagan held that "'when the State elected to introduce' the substance of Cellmark's report into evidence, the analyst who generated that report 'became a witness' whom Williams 'had the right to confront'" *see id.* at 2268 (quoting *Bullcoming*, 131 S. Ct. at 2716).  Justice Kagan did not agree with the plurality's conclusion that the report at issue did not violate the Confrontation Clause because it was not admitted for its truth, stating that "admission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it except assess its truth and so the credibility of the conclusion it serves to buttress."  *Id.* at 2269.  Justice Kagan specifically observed employment of the plurality's analysis would invite error:  "If the Confrontation Clause prevents the State from getting its evidence in through the front door, then the State could sneak it in through the back.  What a neat trick--but really, what a way to run a criminal justice system.  No wonder five Justices reject it."  *Id.* at 2272.  Finally, Justice Kagan emphasized an overarching theme of Confrontation Clause jurisprudence:

> It is not up to us to decide, *ex ante*, what evidence is trustworthy and what is not.  That is because the Confrontation Clause prescribes its own "procedure for determining the reliability of testimony in criminal trials."  That procedure is cross-examination.  And "[d]ispensing with [it] because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty."

*Id.* at 2275 (citations omitted).

We have reviewed the map presently in question. Actually, it is not a map in the common sense; rather, it is an aerial photograph of the area where the school and the defendant's apartment are located. The photograph itself appears to have emanated from KGIS or another governmental office providing geological or planning services. On the photograph, Mr. McKinney delineated the property boundary of Green Magnet Elementary School, which he apparently extracted from the property assessor's records. Mr. McKinney then delineated a 1,000 foot exterior buffer around the property line. He also pinpointed the location of the defendant's apartment and then, through the auspices of his office, computed the distance from the school boundary line to the apartment and recorded the result, 597 feet, on the map.

As noted by Justice Breyer in *Williams*, issues related to the admission of expert evidence are layered. We discern three layers here: (1) the testimony of Mr. McKinney; (2) the map he introduced into evidence; and (3) the underlying data retrieved from governmental offices such as the planning commission and the assessor's office.

The defendant has not challenged the admissibility of Mr. McKinney's testimony. The map itself we deem to be testimonial because Mr. McKinney created the map at the request of the prosecutor for the sole purpose of using it at the defendant's trial. *See Melendez-Diaz*, 129 S. Ct. at 2532 (stating that evidence is testimonial when it is "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (citations omitted)). We cannot discern from Mr. McKinney's testimony whether he created the map to illustrate the calculations that he had already made or whether he created the map as a means of yielding the calculations. In any event, the primary purpose of the map was to facilitate his testimony in this case. That said, the admission of the map did not offend the Confrontation Clause because the creator of that document, Mr. McKinney, testified in court and was cross-examined. *See Bullcoming*, 131 S. Ct. at 2715; *see also Crawford*, 541 U.S. at 59 ("Testimonial statements of *witnesses absent from trial* have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (emphasis added)).

We turn, then, to the underlying data that Mr. McKinney used to create his map. He testified that he utilized information from the KGIS database. The database, curated by KGIS and used in its regular course of business, derived information from various other governmental entities, including the property assessor and the Metropolitan Planning Commission. Although the defendant is correct that the creators of those records were, in this instance, witnesses against her, it does not follow that admission of the records violated her constitutional rights. As the Supreme Court explained, admission of such records

generally does not violate the rulings in *Crawford* and its progeny because "public records are generally admissible absent confrontation . . . because--having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial--they are not testimonial." *Melendez-Diaz*, 129 S. Ct. at 2539-40.

Although we conclude that admission of the map did not violate the defendant's confrontation rights, we do not adopt the reasoning of the trial court. As indicated, the trial court believed that it could take judicial notice of the map. We disagree. "A judicially noticed fact must be one not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b). Although the data used to create the map, as public records, were subject to the court's taking judicial notice, *see State v. Lawson*, 291 S.W.3d 864, 870 (Tenn. 2009), the map itself was not. Nevertheless, as we have shown, the map was admissible into evidence.

*Conclusion*

Because the trial court did not err by admitting the challenged evidence, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE